[No. B148502. Second Dist., Div. Four. Aug. 21, 2001.]

CBS BROADCASTING INC., Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
STATE DEPARTMENT OF SOCIAL SERVICES, Real Party in Interest.

___

___

## COUNSEL

White, O'Connor, Curry, Gatti & Avanzado, Andrew M. White, Jonathan H. Anschell and Carl R. Benedetti for Petitioner.

No appearance for Respondent.

Bill Lockyer, Attorney General, Manuel M. Medeiros, Assistant Attorney General, Kenneth R. Williams and Timothy M. Muscat, Deputy Attorneys General, for Real Party in Interest.

___

## OPINION

**CURRY, J.**—Plaintiff CBS Broadcasting Inc. (CBS), a New York corporation, petitions this court for a writ of mandate to compel the Los Angeles County Superior Court to grant its motion for injunctive relief to restrain defendant State Department of Social Services (DSS) from refusing to comply with its request for disclosure under the California Public Records Act (PRA). (Gov. Code, § 6250 et seq.)[1] CBS seeks disclosure of "[a] list of all persons with criminal convictions who have received exemptions from 1995 to the present from [DSS] that allow such persons to work in licensed day care facilities" as well as "[a] list of all licensed day care facilities with an owner/operator, employee and/or person living at the facility who has received an exemption from [DSS] from 1995 to the present allowing such person to own/operate, work and/or live at the facility . . . ."

"In enacting [the PRA], the Legislature, mindful of the right of individuals to privacy, finds and declares that access to information concerning the conduct of the people's business is a fundamental and necessary right of every person in this state." (§ 6250.) This tension between an individual's right of privacy and the public's right to know lies at the heart of the controversy before this court.

CBS takes the position that the public has the unqualified right to know the identity of every individual granted a criminal conviction exemption to

___

[1]All further section references are to the Government Code unless otherwise indicated.

work in a licensed child daycare facility and the identity of each facility employing such individuals in order to further the important public interest of ensuring that DSS does not abuse its discretion in granting such criminal conviction exemptions. DSS does not dispute the existence and the importance of such public interest. Its position, instead, is grounded primarily in its claim that disclosure of such information is irrelevant to resolving the issue of whether DSS is abusing its discretion and also would constitute an impermissible invasion of the affected individuals' right of privacy.

Based on our review of the record[2] and applicable law, we conclude that CBS's disclosure request constitutes a proper request for public records under the PRA. We therefore grant the petition.

### Procedural and Factual Summary

By letter dated August 11, 2000, CBS requested that DSS allow "KCBS-TV" the opportunity to "inspect any and all 'writings' (as defined in Section 6252 . . .) or other records which contain . . . [a] list of all persons with criminal convictions who have received exemptions from 1995 to the present from [DSS] that allow such persons to work in licensed day care facilities" as well as "[a] list of all licensed day care facilities with an owner/operator, employee and/or person living at the facility who has received an exemption from [DSS] from 1995 to the present allowing such person to own/operate, work and/or live at the facility even though such person has a criminal conviction."

After expressing its belief that "there exists no express provision of law exempting such records from disclosure," CBS requested, "[t]o the extent that a portion of the information requested herein is exempt by express provisions of law," that DSS segregate and delete any exempted material from that material to be provided.

In its response dated September 5, 2000, DSS denied the request pursuant to section 6253, subdivision (c) based on the following enumerated reasons. DSS asserted that nondisclosure was warranted under "an individual's right

---

[2]We grant CBS's request to take judicial notice of the Legislative Analyst's Analysis of Assembly Bill No. 1381, dated July 25, 1968, regarding the enactment of the PRA, and the report of the Assembly Interim Committee on Government Organization, dated January 11, 1965, entitled The Right to Know: The Public's Access to Meetings and Records of Government Agencies, copies of which are attached, respectively, as exhibits 1 and 2 to its request for judicial notice. (See, e.g., *People v. Eubanks* (1996) 14 Cal.4th 580, 591, fn. 3 [59 Cal.Rptr.2d 200, 927 P.2d 310]; *San Mateo County Coastal Landowners' Assn. v. County of San Mateo* (1995) 38 Cal.App.4th 523, 552-553 [45 Cal.Rptr.2d 117]; *Post v. Prati* (1979) 90 Cal.App.3d 626, 633-634 [153 Cal.Rptr. 511].)

to privacy" guaranteed under the California Constitution and case law and pursuant to the nondisclosure provisions of sections 6254 and 6255.

DSS also asserted that "[p]roviding a listing of child care providers with criminal record exemptions will place in the public arena the fact that the individual has a criminal history" and thereby violate sections 11105 and 11142 of the Penal Code, which "clearly prohibit [DSS from] disclosing an individual's RAP sheet or information on the RAP sheet to unauthorized parties, which includes members of the public and media." DSS added that an individual's right of privacy would be further abridged by the potential misuse of the disclosed "criminal history information" to deny him or her employment or a daycare license.

DSS urged that such disclosure could also lead to harmful misimpressions on the part of the public, which might "assume the worst about the child care provider and not use [that] provider[, even though] the child care provider only has a conviction for a minor crime that happened years ago." After pointing out that DSS was statutorily prohibited from granting an exemption "for certain convictions, such as murder, rape, sex offender registration convictions," DSS recounted the procedure that it followed in granting exemptions. DSS "reviews the person's RAP sheet for the nature, recency and number of convictions, plus looks at proof of rehabilitation provided by the person. For minor crimes, like petty theft, and convictions older than ten years, [DSS] routinely grants these exemptions through a simplified process. Last fiscal year, [DSS] granted 7,059 exemptions, of which 3,940 were through the simplified process."

DSS also asserted disclosure was prohibited under the Information Practices Act of 1977 (Civ. Code, § 1798 et seq.) in that disclosure of the fact an individual had a criminal record exemption would "identify the person and unjustifiably intrude on that person's privacy" and therefore, pursuant to Government Code section 6254, subdivision (k) and Civil Code section 1798.24, DSS was not required to release the requested information.

On November 22, 2000, CBS filed a verified complaint for injunctive relief to compel DSS to disclose and provide access to "all non-expressly exempted portions" of the requested information.

On January 11, 2001, CBS filed a motion for an injunction to compel disclosure of the requested DSS records. CBS argued disclosure would serve the public interest, because DSS "is the sole government agency responsible for licensing and overseeing child care facilities, and its decisions about which individuals with criminal convictions will have access to those children is of keen importance to the public" and "there is no oversight or review of [DSS's] decisions."

CBS further argued that DSS failed to carry its burden to prove that disclosure was exempted or prohibited by law. It denied that its request for a list of all persons with criminal convictions who have received exemptions from DSS to work in licensed daycare facilities and for a list of all such facilities which employed such individuals sought " 'state summary criminal history information,' " the disclosure of which was proscribed under section 11105 of the Penal Code and constituted a misdemeanor under section 11142 of the same code.

CBS alternatively argued that an individual's "expectation of privacy is negated by the public nature of the application for a license to operate, work at, or live in a day care facility" and that "[t]he reduction of a convicted person's reasonable expectation of privacy specifically extends to that person's identity."

In its opposition, DSS argued that such confidential criminal history was protected under subdivision (c) of section 6254, which exempts from disclosure "personnel . . . files, the disclosure of which would constitute an unwarranted invasion of personal privacy," and under subdivision (k) of section 6254, which exempts from disclosure such matters the disclosure of which is "prohibited pursuant to federal or state law . . . ." Alternatively, DSS urged that disclosure of the requested criminal history information was exempted under section 6255 in that "the public interest served by not making the requested records public clearly outweighs the public interest served by disclosure of the records."

Essentially, DSS took the twofold position that: (1) disclosure of the identity of an individual who was granted a criminal conviction exemption was not necessary to implement the public's need to know whether DSS abused its discretion in granting such exemptions; and (2) contrary to the public interest to rehabilitate convicted criminals, such disclosure would unjustly "brand these citizens as menacing criminals even if their crimes occurred long ago, and even if these citizens had taken substantial steps toward rehabilitation."

DSS pointed out that it had already provided CBS with: (1) a copy of its exemption "Evaluator Manual," which was attached to its September 5, 2000 letter denying CBS's disclosure request; (2) a detailed description of how the exemption program operated; and (3) "significant statistical information regarding the results of this program. These statistics demonstrate . . . [o]nly 3% of the licensees and employees in the [relevant] database have criminal record exemptions, and of these individuals, only 10% have felony convictions on their rap sheets."

DSS additionally argued that to comply with the unwarranted disclosure request would impose a "significant burden" on DSS in salary costs "exceed[ing] $40,000.00."

As evidentiary support for its multifaceted position, DSS submitted two detailed declarations regarding the operation of its criminal conviction exemption program. The first was the declaration of Bob Hing (Hing), an administrator whose duties and positions qualified him to address DSS's policies and procedures, including storage and maintenance of information, of the Caregiver Background Check Bureau (CBCB). The second was the declaration of Andy Ah Po (Po), whose duties and position as bureau chief for CBCB qualified him to address "the bureau's budget and workload requirements" and DSS's "background check process for individuals seeking licensor and employment in licensed community care facilities."

In his declaration, Hing admitted that DSS maintained computer records which would allow its staff to produce a list of "(1) all persons with criminal convictions who have received exemptions to work at licensed child day care facilities since 1995, and (2) a list of all licensed child day care facilities that employ individuals who have received criminal record exemptions." He opined, however, that such a list "would contain a significant number of errors" which "would incorrectly identify some persons as having received an exemption . . . , even though they had, in fact, received a license without requiring an exemption."

Hing further opined that "it would take a CBCB exemption/licensing analyst approximately 15 minutes to conduct a CBCB file review to validate the exemption status of each person on the above-described list." "From 1995 to 2000, CBCB granted approximately 8700 exemptions for individuals with criminal histories who were seeking employment in a licensed day care facility." He also opined that the cost of the requisite review would be "approximately $43,500.00."

In his declaration, Po stated "approximately 90% of all individuals who initially submit fingerprints for licenses and employment are directly cleared by the DOJ [Department of Justice] and FBI." With regard to the 10 percent who have criminal histories, "most are not automatically excluded . . . ." CBCB provides an exemption process for those not subject to automatic exclusion. "An exemption is denied for such an applicant if the applicant fails to establish his or her 'good character.' In making these exemption determinations, CBCB analysts follow the criteria specified in [the] CCLD [Community Care Licensing Division] Evaluator Manual." Po then proceeded to set forth in detail the process utilized.

CBCB first excludes those applicants who have been convicted of "non-exemptible crimes." Only 2 percent of the 10 percent of applicants with criminal histories fall into this category. "[S]ection 7-2100 of the Evaluator Manual provides analysts with a list of all non-exemptible crimes. . . . These non-exemptible crimes, which are mandated by statute, include a variety of violent and serious felonies such as murder, mayhem, torture, kidnaping, sexual battery, rape, sodomy, incest, lewd or lascivious acts upon [a] child under 14, transporting or distributing child-related pornography, possessing child pornography, advertising or distributing child pornography, and sexual exploitation of children. Such applicants are never eligible for an exemption to work at a licensed child day care facility, and absent a gubernatorial pardon, their applications are always denied by CBCB.

"The second category of applicants who possess criminal records are applicants who have been convicted of minor infractions (including traffic violations) or minor misdemeanors (including non-violent misdemeanors). Applicants who have committed these types of non-serious offenses are processed through a simplified procedure described in section 7-1720 of the CCLD Evaluator Manual."

An exemption may be granted based on "the following criteria: (1) The individual has been convicted of one misdemeanor for driving while under the influence of alcohol with no injury to others and it has been at least three years since the completion of the most recent period of incarceration, probation or parole; or (2) The individual has been convicted of two or fewer of the following misdemeanors (vandalism, perjury, welfare fraud, trespass, false identification to a police officer, petty theft, or any misdemeanor that does not involve injury or harm to other persons), and it has been at least three years since the completion of the most recent period of incarceration, probation or parole; or (3) The individual has been convicted of three of the above-described misdemeanors and it has been at least ten years since the completion of the most recent period of incarceration, probation or parole." An exemption is not automatically granted, however, even if these criteria are met, because CBCB must still "review the applicant's criminal history to determine that there is no indication of behavioral problems (such as multiple D.U.I. arrests), or potential threats that could endanger the health and safety of clients."

CBCB would never grant an exemption under the simplified process based on certain circumstances, including: "(1) There is a demonstrated pattern of crimes resulting from impaired judgment or questionable behavior on the applicant's rap sheet; (2) The applicant's rap sheet contains a conviction within the preceding five years; (3) The applicant's rap sheet contains an

arrest within the last three years that meets the CCLD serious arrest criteria; (4) The applicant has any felony conviction; (5) Though not indicated on the rap sheet, it appears that the applicant's crime is a felony based on the sentence; and (6) The applicant is currently on probation or parole."

The majority of the 10 percent of applicants who have a criminal history fall into the category of applicants who are eligible for an exemption under CBCB's standard process. These are applicants who have been convicted of more serious misdemeanors or a felony not considered to be nonexemptible under section 7-2100 of the CCLD Evaluator Manual. "[A]pproximately 50% of the applicants who are eligible for a possible exemption under the standard process fail to formally request an exemption, and these cases are subsequently closed."

Of the remaining 50 percent standard process exemption applicants, CBCB "consider[s] the following factors when reviewing the applicants' criminal convictions: (1) the type of crime, (2) the nature of the crime, (3) the recency of the crime, (4) the circumstances surrounding the crime, (5) the frequency of crimes[,] (6) the status of the applicant's probation, (7) the applicant's rehabilitation efforts, (8) the applicant's personal references, (9) the demonstrated personal honesty or integrity of the applicant, and (10) the applicant's proposed duties at the licensed facility."

CBCB weighs these factors in conjunction with the review of "several documents, including, but not limited to, (1) the applicant's confidential rap sheet, (2) any counseling, educational, therapy or rehabilitation records provided by the applicant, (3) three signed character references, and (4) a written statement signed by the applicant that describes the criminal conviction and the efforts undertaken by the applicant to reform his or her life." CBCB will deny the requested exemption if a review of the applicant's file fails to eliminate the potential risk or threat to clients and fails to establish the applicant's " 'good character . . . .' "

Section 7-1731 of the CCLD Evaluator Manual describes in detail a " 'step-by-step' " analysis for weighing these factors. Several issues to be considered in examining the applicant's criminal conviction include: "(1) whether the applicant's crime involves any violence, (2) whether there were any victims as a result of the applicant's crime, (3) did the applicant make restitution, (4) the applicant's age at the time of the crime, (5) whether the applicant committed a pattern of repeated offenses, and (6) how long ago was the applicant's crime committed. Analysts are also instructed to compare the facts surrounding the applicant's conviction with the description of the applicant's proposed job duties at the licensed facility. For example, the

Evaluator Manual instructs that an applicant with a driving under the influence conviction would not be suitable for transporting clients."

Other factors include the accuracy and honesty of the applicant's written statement about his or her crime, including such matters as whether the applicant accepted responsibility for the crime and demonstrated remorse therefor. Also, CBCB reviews the applicant's file regarding his or her "good character" following conviction, based on such factors as participation in and completion of rehabilitation programs, return to or completion of school, postconviction gainful employment history, and any other "compelling evidence that supports a claim of rehabilitation."

Additionally, two further levels of review are provided for in the CCLD Evaluator Manual. Certain subgroups of applicants, such as individuals with three or fewer nonviolent misdemeanors who have completed the last period of probation or parole and a year has passed since the period, cannot be granted an exemption "in the absence of a Section Manager's formal approval." Also, "an exemption approval for any applicant with any felony conviction on his or her rap sheet must receive a second level review" with regard to his or her good character following conviction and the absence of "a potential risk or threat to clients."

With regard to application of the relevant factors, CBCB "generally grant[s] exemptions for applicants who have minor misdemeanor convictions" and may grant an exemption "if the applicant has an older non-violent felony conviction." On the other hand, CBCB "rarely" grants exemptions for a violent felony, and "only after required Bureau Chief Approval," if such felony occurred over 10 years earlier and "the applicant had clearly documented his or her rehabilitation and 'good character' following the conviction."

CBCB's statistics reflected that "[i]n January 2000, there were 493,175 active individuals (license and employees) in CBCB's database. Of these, 15,239, roughly 3% had criminal record exemptions." Only 10 percent of this figure involved felony convictions.

In its reply, CBS argued DSS failed to cite any authority that would justify nondisclosure of the information sought, i.e., "non-private, criminal conviction data (rather than broader 'rap sheet' information) of individuals granted exemptions by [DSS] to work at or reside in licensed day care centers." Although acknowledging "the existence of the guidelines described" in the opposition which DSS stated it applied in granting or denying the exemptions, CBS argued such "administrative guidelines or policies do[] not

exempt . . . [DSS] from public disclosure of the real <u>results</u> of its operations" and DSS has failed to demonstrate any "compelling grounds for keeping secret its decisions to permit convicted criminals to work or reside in licensed child care centers." CBS also disagreed that DSS had identified any "countervailing public interest against disclosure" or that the burden on DSS "in terms of both time and money" outweighed the public interest in disclosure of the requested information.

On February 26, 2001, at the hearing on the motion, the court asked CBS to state "exactly what it is [it was] asking for," e.g., "the list of names of individuals with criminal convictions who have received exemptions" or "their application?" Jonathan H. Anschell, counsel for CBS, responded that "at this point what [CBS is] seeking is what was sought by CBS informally," i.e., "a list of individuals with criminal convictions who have been granted [exemptions to] work in child-care centers" and "a corresponding list which [DSS] has also indicated exists or could be made available of those day-care centers or facilities which employ [such] individuals . . . ."

By way of clarification, Mr. Anschell added that CBS was "not seeking background information, rap sheet information, confidential history, [but, rather] simply the fact of the conviction, the fact of the exemptions and information regarding the facility regarding where that individual may or may not work." In response to further inquiry by the court, he restated CBS's position that the "two lists" sought consisted of a list of "individuals with convictions who have received exemptions," and a "list of licensed facilities which have an owner/operator, employee or other person living at the facility who has received such an . . . exemption."

Timothy M. Muscat, the deputy attorney general representing DSS, agreed with the court's characterization that the writings at issue were "personnel records" as contrasted with "license applications for licensees[.]" When asked whether a license application on its face would contain the information sought, Mr. Muscat replied "not necessarily[.]" He explained that if someone failed to disclose the fact he or she had suffered a criminal conviction on the application, such information might be independently discoverable by DSS, because every applicant has "to submit their fingerprints for the DOJ and FBI criminal background check."

When asked whether the application to run a daycare center was a public or private document, Mr. Muscat responded that, based on the manner in which DSS kept its records, it was a private document. Carol Grossman, a DSS staff attorney, stated DSS treated the application "as confidential" and "kept [it] in the confidential section of the file" and considered it to be a private document that was not subject to disclosure as a public record.

Ms. Grossman further stated, however, that if the application were requested, "the identifying information would be redacted. However, once the license is granted, of course the names of the licensees are public records." She explained that there exists a list of licensed daycare facilities that's "published on a web site" which is separate and distinct from the list of "family day-care homes," which is not published. At the court's request, she further explained that general daycare facilities are in "more institutional settings" and are "more public[,]" such as "school-run facilities" as contrasted with family home daycare facilities which are "in someone's home . . . ." She added that the list of family home daycare facilities "is kept more confidential" in that it would "be given to interested parents from a referral agency but [the list does not] go up on the web site."

When the court asked if CBS requested a list of all the daycare centers in California, Mr. Anschell replied no. Ms. Grossman stated, in response to the court's further inquiry, that if CBS sought such a list, it could obtain it on the Web site, except for a list of small family home daycare facilities, by searching, she believed, the names of the licensees and that such list was a "public record."

When queried by the court, Mr. Anschell admitted CBS could go to the county clerk's office of any county in which a person operating a daycare facility resided and input the name of that person and his or her date of birth—if both were known to CBS—into the clerk's computer in order to determine if that person had suffered a conviction. After acknowledging CBS had not done this, he argued CBS should not be compelled to do so, because this procedure would place "an undue burden" on CBS that "would be equivalent to [seeking] a needle in a haystack." He further argued that, on the other hand, a list of persons who had suffered a criminal conviction was information which DSS admitted it could and should be forced to generate, because "the government should disclose not only the nature of its procedures and how [they] work statistically or in the abstract, but also the real results of those procedures."

Mr. Muscat argued that under "the catchall exception," i.e., section 6255, DSS properly balanced the individual's right of privacy against the public's need to know by "immediately" giving CBS a copy of DSS's "exception manual" and "a declaration under penalty of perjury, which again explained in detail not only how the process works but the results, statistical results in how the program operates" and only withholding the "identifying individual names . . . ."

He argued that DSS also would be committing a misdemeanor under subdivision (k) of Government Code section 6254 and the Information

Practices Act of 1977 (Civ. Code, § 1798 et seq.) by disclosing such identifying information, because DSS would confirm whether the individuals in question were convicted misdemeanants or felons "[b]ased on DOJ and FBI rap sheets" provided to DSS.

He further argued "the important distinction to make, and CBS does not go into this in their reply brief, is that each exemption needs to be analyzed on its own basis." Accordingly, nondisclosure is justified under subdivision (c) of section 6253, which, he urged, protects against "the unwarranted invasion of personal [*sic*] records . . . ."

The court characterized the situation as one involving a dilemma in that, on one hand, whether a person suffered a criminal conviction is clearly a matter of public information, yet, on the other, that same information "[t]heoretically" is "confidential" in the context of a job application and nondisclosure by the applicant could lead to loss of the job if such information is subsequently discovered.

Mr. Anschell disagreed with the court's assessment. He argued that CBS is "simply seeking . . . a correlation that is uniquely in the government's possession between two pieces of inherently public information. One is the criminal record. That's public. The other is the existence of a publicly issued license to work in a day-care facility, also public."

Mr. Muscat argued that CBS was welcome to make such a correlation on its own, but it had no right to "use the state as a strong arm to give them information that they need."

The court announced its concern that what CBS sought would not be an accurate reflection of the criminal conviction exemption granted in each particular case. It noted that CBS "would not have available . . . the rehabilitative efforts that the individual had made or the record of the rehabilitative efforts that had been made or the entire investigation with all of the, I believe it was, three references that [the applicant had] to give, and [CBS] wouldn't have the entire investigation which may have revealed that that person had rehabilitated themselves [*sic*] [and] hence getting the license."

The court added that based on its own research, it noted that applications for real estate brokers and salespersons filed with the real estate commission were not public records and that inspection of such matters, except the names and addresses of the applicants, was a matter within the sound discretion of the commissioner. The court was concerned whether daycare

worker applications should be deemed public records in view of the fact that the application of a real estate broker or salesperson, which "certainly is not as important" a matter as a daycare worker, is not a public record.

In agreeing with DSS's position that its exemption program was "not secret[,]" the court stated that "[i]t appears that the Legislature has put in place a system designed to protect our most valuable resource, our children[, and] the Legislature has enabled the various departments in the state of California to establish screens for reviewing individuals who are applying for certain kinds of licenses and has enabled them to develop scheme reviews."

The court denied CBS's motion for injunctive relief on the grounds that "[i]t appears that the rights of privacy have been taken into consideration by the Legislature and it's weighed out in favor of nondisclosure based upon the structure that has been set up for review of applicants" and that the appropriate forum to challenge or change this procedure would be the Legislature. It added as "[a] caveat," however, that CBS would be entitled to a list of all daycare centers in California if it requested such a list from DSS, with the exception of family daycare centers, and that even in that latter situation, with a protective order, CBS would also be entitled to that list.

In the judgment, the court made the following express findings: "[T]he state has in place an established statutorily-mandated exemption program to review individuals seeking licenses to operate or work in licensed community care facilities, including licensed day care facilities." "[T]he existing privacy concerns taken into account by the department's statutorily-mandated exemption program are consistent with the [PRA] and California law, and that these appropriate privacy concerns favor non-disclosure in this case. Thus, the proper forum for the demand by CBS for the disclosure of its requested information is the California Legislature, and not this Court."

The court then concluded DSS did not violate the PRA by failing to provide CBS with "(1) a list of all persons with criminal convictions who have received exemptions to work at licensed child day care facilities since 1995, and (2) a list of all licensed child day care facilities that employ individuals who have received criminal record exemptions."

## STANDARD OF REVIEW

"Pursuant to section 6259, subdivision (c), an order of the trial court under the [PRA], which either directs disclosure of records by a public official or supports the official's refusal to disclose records, is immediately

reviewable by petition to the appellate court for issuance of an extraordinary writ. . . . The standard for review of the order is 'an independent review of the trial court's ruling; factual findings made by the trial court will be upheld if based on substantial evidence.' " (*City of San Jose v. Superior Court* (1999) 74 Cal.App.4th 1008, 1016 [88 Cal.Rptr.2d 552], citations omitted.) In contrast, the interpretation of the PRA and its application to undisputed facts present questions of law subject to de novo appellate review. (See, e.g., *CBS, Inc. v. Block* (1986) 42 Cal.3d 646, 651 [230 Cal.Rptr. 362, 725 P.2d 470]; *Lorig v. Medical Board* (2000) 78 Cal.App.4th 462, 467 [92 Cal.Rptr.2d 862].)

## DISCUSSION

In its petition, CBS renews its position that it has established both the public interest in disclosure of the requested information and that such disclosure is not prohibited by law. CBS contends that the public is entitled to know if convicted criminals are employed at licensed daycare facilities and which facilities employ such convicted criminals and that there is no exception that would bar disclosure of this information.

We find CBS's position to be well founded. It is uncontroverted that the public has an overwhelming interest in making sure that DSS does not abuse its discretion in granting exemptions that will allow individuals with qualifying criminal convictions to be employed at child daycare centers licensed by DSS. Accordingly, "there is a clear and legislatively articulated justification for disclosure—the right of the public and the press to review the government's conduct of its business." (*CBS, Inc. v. Block, supra*, 42 Cal.3d at p. 654.)

Contrary to DSS's position, such review is not restricted to such information as the agency under scrutiny sees fit to disclose. Rather, the information which must be disclosed is that which "enables the press and the public to ensure that public officials are acting properly in issuing licenses for legitimate reasons." (*CBS, Inc. v. Block, supra*, 42 Cal.3d at p. 654.)

We conclude that DSS's disclosure in detail of how it operates the exemption process, as set forth in Po's declaration, does not satisfy the PRA's directive that the public have access to "information concerning the conduct of the people's business . . . ." (§ 6250.) The identity of each individual granted a criminal conviction exemption and the identity of each licensed child daycare facility employing such individual clearly fall within the sphere of such information. Unless some exemption applies to preclude such disclosure, DSS therefore is duty-bound under the PRA to disclose this additional information.

Initially, we conclude that nondisclosure is not compelled under subdivision (c) of section 6254, which exempts disclosure of "[p]ersonnel, medical, or similar files, the disclosure of which would constitute an unwarranted invasion of personal privacy." DSS concedes, as it must, that the identity of an individual who has been convicted of a crime and the identity of each individual who received a license to work, operate, or own a child daycare facility are matters of public record.

We further conclude that nondisclosure is also not compelled under subdivision (k) of Government Code section 6254, which exempts "[r]ecords the disclosure of which is exempted or prohibited pursuant to federal or state law, including, but not limited to, provisions of the Evidence Code relating to privilege." It should be noted that "subdivision (k) is not an independent exemption. It merely incorporates other prohibitions established by law." (*CBS, Inc. v. Block, supra*, 42 Cal.3d at p. 656.) Contrary to DSS's claim, disclosure of the requested information would not cause DSS to violate Penal Code sections 11105 and 11142, and thus fall within the ambit of subdivision (k) of section 6254.

Penal Code section 11105 pertains to the maintenance and furnishing to authorized persons " '[s]tate summary criminal history information[,]' " which "means the master record of information complied by the Attorney General pertaining to the identification and criminal history of any person, such as name, date of birth, physical description, fingerprints, photographs, date of arrests, arresting agencies and booking numbers, charges, dispositions, and similar data about the person." (Pen. Code, § 11105, subd. (a)(2)(A).) Excluded from that definition are "records and data compiled by criminal justice agencies, other than the Attorney General, nor does [the definition] refer to records of complaints to or investigations conducted by, or records of intelligence information or security procedures of, the office of the Attorney General and the Department of Justice." (Pen. Code, § 11105, subd. (a)(2)(B).) Additionally, "[i]t is not a violation of this section to include information obtained from a record in (1) a transcript or record of a judicial or administrative proceeding or (2) any other public record if the inclusion of the information in the public record is authorized by a court, statute, or decisional law." (Pen. Code, § 11105, subd. (h).)

Section 11142 of the Penal Code simply provides that "[a]ny person authorized by law to receive a record or information obtained from a record who knowingly furnishes the record or information to a person who is not authorized by law to receive the record or information is guilty of a misdemeanor."

A plain reading of these Penal Code sections clearly reveals they are actually inapposite to the requested information. CBS is not seeking information about the convictions suffered by the individuals granted criminal

conviction exemptions, nor is it seeking any other privileged information, such as the date of birth of such individual and his or her physical description. In any event, the fact that an individual suffered a criminal conviction, as conceded by DSS, is a matter of public record. Accordingly, disclosure by DSS of the identity of each individual granted a criminal conviction exemption does not violate either section 11105 or 11142 of the Penal Code and therefore does not serve as an underlying basis for nondisclosure under subdivision (k) of Government Code section 6254. (Cf. *U.S. Dept. of Justice v. Reporters Committee* (1989) 489 U.S. 749, 757, 762-763, 765-766, 775, 780 [109 S.Ct. 1468, 1473-1474, 1476-1477, 1477-1478, 1485-1486, 103 L.Ed.2d 774] [rejecting, as an unwarranted invasion of privacy, the news media's request under the federal Freedom of Information Act (FOIA) for disclosure of any convictions, inter alia, of a reputed organized crime figure set forth in his "rap sheet" even though "events summarized in a rap sheet have been previously disclosed to the public" based, in part, on the reasoning that disclosure of such information regarding a particular individual would not serve to contribute significantly to the public's understanding of the government's operations or activities, the "core purpose of the FOIA[.]"].)

We also conclude that nondisclosure is not compelled by reason of the "catchall" provision of section 6255, which authorizes the withholding of the requested information if " 'on the facts of a particular case the public interest served by not making the record public *clearly outweighs* the public interest served by disclosure of the record.' " (*CBS, Inc. v. Block, supra,* 42 Cal.3d at p. 652, fn. omitted.)

 "The burden of proof is on the proponent of nondisclosure, who must demonstrate a 'clear overbalance' on the side of confidentiality." (*City of San Jose v. Superior Court, supra,* 74 Cal.App.4th at p. 1018.) "[I]n determining whether public records which are not expressly exempted from disclosure must be disclosed over the government's objection, California courts apply the section 6255 balancing test for the catchall exception on a case-by-case basis. Where the public interest in disclosure of the records is not outweighed by the public interest in nondisclosure, courts will direct the government to disclose the requested information." (*Ibid.*)

 We find DSS has failed to carry its burden. Initially, we again point out the fact a specific individual suffered a criminal conviction is a matter of public record. Additionally, we conclude that, to the extent that such individual maintains any privacy interest in nondisclosure of such fact, he or she has subjected himself or herself to public review by virtue of applying for a license to work at, operate, or own a child daycare facility, which license also constitutes a matter of public record.

The propriety of CBS's usage of the requested information is not before this court. (See, e.g., *City of San Jose v. Superior Court, supra,* 74 Cal.App.4th at p. 1018 ["The purpose of the requesting party in seeking disclosure cannot be considered."]; but see *Melvin v. Reid* (1931) 112 Cal.App. 285, 291-292 [297 P. 91].)

We note that DSS has not set forth any protectable privacy interest of a licensed child daycare facility which would justify nondisclosure of its identity as a facility which employs an individual who has been granted a criminal conviction exemption. DSS thus has failed to carry its initial burden to posit any "public interest served by not making the record public" (former § 6255)[3] with respect to the identity of such facilities. In the absence of such interest, DSS has not, and cannot, fulfill its ultimate burden to "demonstrate a 'clear overbalance' on the side of confidentiality" rather than disclosure of the identity of such facilities. (*City of San Jose v. Superior Court, supra,* 74 Cal.App.4th at p. 1018.)

Finally, we reject, as patently untenable, DSS's position that costs in the approximate amount of $43,000 to compile an accurate list of the individuals granted criminal conviction exemptions is a valid reason to proscribe disclosure of the identity of such individuals. DSS has no legitimate interest in maintaining an inaccurate list of such individuals. On the contrary, the public interest compels DSS to expend whatever funds necessary to ensure the accuracy of such list.

### DISPOSITION

Let a peremptory writ issue directing respondent court to vacate its judgment denying the motion for injunctive relief and to enter a new and different judgment granting such motion. Each party is to bear its own costs in this original proceeding.

Epstein, Acting P. J., and Hastings, J., concurred.

---

[3]Section 6255 was amended in 2000 to designate the existing language of that section as subdivision (a); to substitute the phrase "by not disclosing the record clearly outweighs" for the phrase "by not making the record public clearly outweigh"; and to add subdivision (b), which relates to the requirement of a response to a written request for inspection or copies of public records to be in writing. (Stats. 2000, ch. 982, § 3.)