[No. C050224. Third Dist. Sept. 29, 2006.]

BRV, INC., Petitioner, v.
THE SUPERIOR COURT OF SISKIYOU COUNTY, Respondent;
DUNSMUIR JOINT UNION HIGH SCHOOL DISTRICT et al., Real
Parties in Interest.

**COUNSEL**

Law Offices of Walter P. McNeill and Walter P. McNeill for Petitioner.

Levy, Ram & Olson, Karl Olson, Thomas W. Newton; Karlene Goller; and Harold W. Fuson, Jr., for California Newspaper Publishers Association, Los Angeles Times Communications LLC and The Copley Press, Inc., as Amici Curiae on behalf of Petitioner.

No appearance for Respondent.

Halkides, Morgan & Kelley and John P. Kelley for Real Party in Interest Dunsmuir Joint Union High School District.

Enochian & Kenny, John Sullivan Kenny and Mark D. Norcross for Real Party in Interest Robert Morris.

**OPINION**

**NICHOLSON, Acting P. J.**—Californians have a constitutional right to access the records of their public agencies. They have a strong interest in knowing how government officials conduct public business, particularly when allegations of malfeasance by public officers are raised.

Here, a school district's board of education hired an investigator to prepare a report analyzing allegations of misconduct by the district's superintendent. Portions of the report were released to a newspaper by persons the investigator had interviewed.

After receiving the full report in confidence, the board of education entered into an agreement with the superintendent accepting his resignation in exchange for terms of payment and a promise to keep the report confidential. The public and the media smelled a "sweetheart deal" and demanded the board release the report. The board refused, and the trial court upheld the board's decision.

We must determine whether the California Public Records Act (Gov. Code, § 6250 et seq.; Public Records Act or the Act)[1] requires the report to be released or allows it to remain confidential. Under the circumstances presented here, we conclude the Public Records Act requires disclosure, subject to conditions.

## FACTS

Real party in interest Dunsmuir Joint Union High School District (the District) operates Dunsmuir High School. The school serves about 135 students in grades nine through 12. In March 2004, the District received approximately 13 letters complaining about the behavior of real party in interest Robert Morris, superintendent of the District and principal of Dunsmuir High School. The letters alleged Morris verbally abused students in disciplinary settings and sexually harassed female students.

On April 22, 2004, the District's board of trustees (the Board) met in closed session, where it listened to parents voice their complaints about Morris.

On May 4, 2004, the Board convened a special meeting. The meeting's agenda noted the Board would meet in closed session to discuss, among other matters, "Public Employee Performance Evaluation (Superintendent)" and "Discipline/Dismissal/Release." Following the closed session, the Board in open session voted unanimously to retain Diane Davis, a private investigator, to investigate the complaints against Morris.

The Board directed Davis to interview complaining witnesses by telephone and to prepare written summaries of those interviews. It also asked Davis to

---

[1] All undesignated section references are to the Government Code.

provide her conclusions regarding the truth of the complaints and whether the evidence provided by the complainants supported the allegations.

On May 11, 2004, the Board met in closed session with Morris for over two hours. At the conclusion of the closed session, it was announced that Morris had requested, and the Board had agreed, that Morris's employment contract would not be renewed after its scheduled expiration in June 2006.

Meanwhile, Davis conducted numerous interviews. The District informed the trial court Davis interviewed 27 people. She interviewed parents, current students, former students, and District employees. She prepared 25 summaries documenting these interviews. Davis prepared nine additional memoranda recording various investigative steps she took. Also, Davis prepared a lengthy letter detailing her findings and opinions following her investigation. She dated the report June 24, 2004, and submitted the letter, the interview summaries, the additional memoranda, and her interview notes as her report to the District.

Under cover of letters dated July 19, 2004, the Board transmitted to a limited number of complainants a copy of Davis's interview summary of that complainant, and solicited the complainant's review and comment. Petitioner BRV, Inc. (BRV), publisher of the Redding Record Searchlight newspaper, obtained copies of eight such letters, nine interview summaries, and the responses of each complainant to those summaries. They are included in the record. The word "Confidential" appears at the top of each interview summary.

On July 23, 2004, Morris resigned from his positions effective December 31, 2004, conditioned on the Board accepting a written agreement between him and the District, also dated July 23, 2004. The agreement had been negotiated by legal counsel for the District and for Morris. On July 26, 2004, the Board accepted Morris's resignation and agreed to the terms of the written agreement.

Under the agreement, Morris was placed on paid administrative leave from July 23 through December 31, 2004, at which time his retirement would take effect. His salary was increased by $5,000 payable during the time he spent on leave. Morris also agreed not to "participate in any District or school activities, functions, meetings or otherwise nor shall [he] appear on any District property at any time during the paid leave of absence . . . ."

The District agreed not to release any documents in Morris's personnel file except with Morris's consent or as required by law. The District also agreed to "seal and place in a sealed envelope in [Morris's] personnel file any and all

documents relating to the investigation conducted by Diane Davis on behalf of the District and no information on such investigation shall be released to any third party except as required by law or in accordance with any court order or subpoena."

Between July and August 2004, some 40 tort claims were filed with the District regarding Morris's conduct and Davis's investigation.

On July 29, 2004, BRV filed a request with the District under the Public Records Act to obtain copies of Davis's report, any documentation relating to the District's retention of Davis, and any letter of resignation submitted by Morris.

On August 9, 2004, the District provided BRV with everything it had requested except Davis's report. The District stated Davis's report was exempt from disclosure under the Public Records Act.

BRV filed a petition for writ of mandate against the District seeking disclosure of Davis's report. All Siskiyou County Superior Court judges recused themselves or were disqualified. The petition was heard by the Honorable John K. Letton, retired Trinity County Superior Court Judge.

Following an in camera review, the trial court determined almost all of Davis's report, including the interview summaries she prepared, were not required to be disclosed under the Public Records Act's personnel records exception, section 6254, subdivision (c). It ordered only those portions of the report regarding complaints of Morris yelling at students be disclosed. All other portions would remain confidential, even though they tended to exonerate Morris. The court found this to be an odd result, but felt constrained by case law not to disclose complaints that were determined not to be credible or to concern serious matters.

The court also determined the District did not waive its right to prevent disclosure of the report by transmitting interview summaries to the complainants for their review and comment.

BRV sought writ relief from this court, claiming the trial court erred. We issued an alternative writ, and now address the merits.[2]

---

[2] Appearing as amici curiae in support of petitioner are the California Newspaper Publishers Association, The Copley Press, Inc., and Los Angeles Times Communications LLC.

## DISCUSSION

### I

### *Standard of Review*

A trial court's order directing disclosure of records by a public official, or supporting the official's refusal to disclose records under the Public Records Act, is immediately reviewable by petition to the appellate court for issuance of an extraordinary writ. (§ 6259, subd. (c); *Times Mirror Co. v. Superior Court* (1991) 53 Cal.3d 1325, 1336 [283 Cal.Rptr. 893, 813 P.2d 240].) Factual findings made by the trial court will be upheld if based on substantial evidence. But the interpretation of the Public Records Act, and its application to undisputed facts, present questions of law that are subject to de novo appellate review. (*CBS Broadcasting Inc. v. Superior Court* (2001) 91 Cal.App.4th 892, 905–906 [110 Cal.Rptr.2d 889].)

### II

### *Statutory Background*

■ "The [Public Records Act] 'provides for the inspection of public records maintained by state and local agencies.' [Citation.] The Legislature enacted the [Act] in 1968 to give the public access to information in possession of public agencies in furtherance of the notion that government should be accountable for its actions and, in order to verify accountability, individuals must have access to government files. [Citation.] But '[r]ecognition of the importance of preserving individual privacy is also evident in [the Act]. The Act begins with the phrase: "In enacting this chapter, the Legislature [is] mindful of the right of individuals to privacy . . . ." [Citation.]' [Citation.] 'Disclosure of public records thus involves two fundamental yet competing interests: (1) prevention of secrecy in government; and (2) protection of individual privacy.' [Citation.]" (*Gilbert v. City of San Jose* (2003) 114 Cal.App.4th 606, 610 [7 Cal.Rptr.3d 692].)

In 2004, California voters approved Proposition 59, which enshrined in our state Constitution the public's right to access records of public agencies. (Cal. Const., art. I, § 3, subd. (b).) By its own terms, however, the amendment has little impact on our construction of the Public Records Act as that statute applies to this case. The amendment requires the Public Records Act to "be broadly construed if it furthers the people's right of access, and narrowly construed if it limits the right of access." (Cal. Const., art. I, § 3, subd. (b), par. (2).) Such was the law prior to the amendment's enactment. (*California*

*State University, Fresno Assn., Inc. v. Superior Court* (2001) 90 Cal.App.4th 810, 831 [108 Cal.Rptr.2d 870].)

Moreover, the amendment does not modify or further limit an individual's right of privacy as protected by the Public Records Act. Nothing in the amendment "supersedes or modifies the right of privacy guaranteed by Section 1 [of the state Constitution] or affects the construction of any statute [such as the Public Records Act], court rule, or other authority to the extent that it protects that right to privacy . . . ." (Cal. Const., art. I, § 3, subd. (b), par. (3).) As will be explained below, Morris's right to privacy is implicated by BRV's request. We thus will rely on the terms of the Public Records Act and its jurisprudence to resolve this matter.

■ All public records are subject to disclosure unless the Public Records Act expressly provides otherwise. (*Williams v. Superior Court* (1993) 5 Cal.4th 337, 346 [19 Cal.Rptr.2d 882, 852 P.2d 377].) The trial court found two exemptions relevant here. The first, subdivision (c) of section 6254, exempts from disclosure "[p]ersonnel, medical, or similar files, the disclosure of which would constitute an unwarranted invasion of personal privacy." The second is the Act's so-called "catchall exception," section 6255. This provision allows an agency to withhold public records where no express exemption may apply if the agency can demonstrate "that on the facts of the particular case the public interest served by not disclosing the record clearly outweighs the public interest served by disclosure of the record." (§ 6255, subd. (a).)

■ We directed the parties to address in supplemental briefing a third exemption that may apply, one originally raised by the District at trial. Under Education Code section 49076, a school district may not grant any person access to "pupil records" without written parental consent or judicial order except under circumstances not relevant here. (Ed. Code, § 49076.) This statute prevails over the Public Records Act. (Ed. Code, § 49060; Gov. Code, § 6254, subd. (k).) We thus turn our attention first to this provision, determining whether Davis's report constitutes "pupil records" within the meaning of Education Code section 49076.

### III

#### *Pupil Records*

■ Education Code section 49076 is part of a statutory response to Congress's adoption of the Family Educational Rights and Privacy Act of 1974 (FERPA), 20 U.S.C. § 1232g. "Congress enacted FERPA 'to assure parents of students . . . access to their educational records and to protect such

individuals' rights to privacy by limiting the transferability of their records without their consent.' [Citation.] Under its terms, educational institutions, with a few exceptions not material here, must obtain written parental consent prior to releasing students' records or information derived therefrom. The statute takes a carrot-and-stick approach: the carrot is federal funding; the stick is the termination of such funding to any educational institution 'which has a policy or practice of permitting the release of educational records (or personally identifiable information contained therein . . .) of students without the written consent of their parents.' (20 U.S.C. § 1232g(b)(1).)" (*Frazier v. Fairhaven School Committee* (1st Cir. 2002) 276 F.3d 52, 67–68.) The California Legislature adopted a statutory scheme to eliminate potential conflicts between FERPA and state law, including the Public Records Act. (Ed. Code, § 49060.)

California law defines "pupil records" as "any item of information directly related to an identifiable pupil, other than directory information, which is maintained by a school district . . . ." (Ed. Code, § 49061, subd. (b).) FERPA defines " 'education records' " in nearly identical terms. (20 U.S.C. § 1232g(a)(4)(A).)

Implementing regulations promulgated by the State Department of Education further explain the term: " 'Pupil Record' means information relative to an individual pupil gathered within or without the school system and maintained within the school system, regardless of the physical form in which it is maintained. Essential in this definition is the idea that any information which is maintained for the purpose of second party review is considered a pupil record." (Cal. Code Regs., tit. 5, § 430, subd. (d).)

Judicial authority interpreting the term is scant. Federal courts interpreting FERPA, for example, have held the following records not to be education records: students' individual assignments handled by student graders in their separate classrooms (*Owasso Independent School Dist. No. I-011 v. Falvo* (2002) 534 U.S. 426, 432–436 [151 L.Ed.2d 896, 904–906, 122 S.Ct. 934] (*Falvo*)); transcripts of students' depositions in a sexual harassment case against a school coach that were not maintained by the school (*Jennings v. University of N.C. at Chapel Hill* (M.D.N.C. 2004) 340 F.Supp.2d 679, 683–684); and a voluntary student survey participated in anonymously (*C.N. v. Ridgewood Bd. of Educ.* (D.N.J. 2001) 146 F.Supp.2d 528, 538, affd. in part, revd. in part (3d Cir. 2001) 281 F.3d 219).

Records found by federal courts to be education records under FERPA include student disciplinary records (*U.S. v. Miami University* (S.D. Ohio 2000) 91 F.Supp.2d 1132, 1149), and district records relating to a student's juvenile

court proceedings and kept in the school district's attorney's files (*Belanger v. Nashua, New Hampshire, School Dist.* (D.N.H. 1994) 856 F.Supp. 40, 50 (*Belanger*)).

The *Belanger* court noted Congress intended the definition of "education record" to be broad. The current definition, enacted in 1974, " 'define[s] "education records" in order to make clear what documents and other material parents and students will have access to . . . [The] intent to be that, except as provided in the definition, *parents and students should have access to everything in institutional records maintained for each student in the normal course of business and used by the institution in making decisions that affect the life of the student.* 120 Cong.Rec. at 39858–39859 (emphasis added)." (*Belanger, supra,* 856 F.Supp. at p. 49.)

Nonetheless, in holding students' assignments were not education records, the Supreme Court clarified that not every record in a school concerning a student is an education record. The court relied in part on a provision of FERPA that requires agencies to keep a separate record listing those who request access to a student's education records. (20 U.S.C. § 1232g(b)(4)(A).) "FERPA requires 'a record' of access for each pupil. This single record must be kept 'with the education records.' This suggests Congress contemplated that education records would be kept in one place with a single record of access. By describing a 'school official' and 'his assistants' as the personnel responsible for the custody of the records, FERPA implies that education records are *institutional records kept by a single central custodian,* such as a registrar, not individual assignments handled by many student graders in their separate classrooms." (*Falvo, supra,* 534 U.S. at pp. 434–435, italics added.)

The Tenth Circuit Court of Appeals also limited the scope of "education records" in an unreported decision which that court's local rule allows us to cite for persuasive value. (U.S. Cir. Ct. Rules (10th Cir.), rule 36.3; Cal. Rules of Court, rule 977(a), (c) [prohibition against citing unpublished opinions applies to opinions of California courts].) In *Jensen v. Reeves* (10th Cir. 2001) 3 Fed.Appx. 905 (*Jensen*), a school official sent reports to the parents of victims and witnesses of a particular student's verbal and physical harassment. In one instance, the report explained the investigation conducted in response to a complaint, the facts discerned, and the discipline taken against the offending student. In another instance, the reports summarized the incident, explained the addressee's child had been involved and had been interviewed, and stated the alleged perpetrator had been warned. (*Id.* at p. 910.)

The Court of Appeals determined the school did not violate FERPA by releasing the investigation reports. The reports were not "education records."

"[T]he contemporaneous disclosure to the parents of a victimized child of the results of any investigation and resulting disciplinary actions taken against an alleged child perpetrator does not constitute a release of an 'education record' within the meaning of 20 U.S.C. § 1232g(a)(4)(A). Reading such disclosures to fall within the ambit of § 1232g would place educators in an untenable position: they could not adequately convey to the parents of affected students that adequate steps were being undertaken to assure the safety of the student. Nor do we think that such a targeted, discrete, contemporaneous disclosure fits within the bounds of the plain language of § 1232g(a)(4)(A)." (*Jensen, supra*, 3 Fed.Appx. at p. 910.)

Even less authority exists interpreting the California statute. *Poway Unified School Dist. v. Superior Court* (1998) 62 Cal.App.4th 1496 [73 Cal.Rptr.2d 777] (*Poway Unified*), is the only reported California case found by the parties and us addressing the issue. There, a newspaper sought access to tort claims filed against a school district arising from hazing incidents at a high school. One claim was filed by a student who pled guilty in juvenile court to sodomizing another student with a broomstick. The claim included a description of prurient details about the attack. (*Id.* at pp. 1499–1500.)

Although the Court of Appeal acknowledged Education Code section 49061 defined "pupil records" broadly (*Poway Unified, supra*, 62 Cal.App.4th at pp. 1506–1507), it determined neither the statute nor FERPA prevented releasing the tort claims to the media. "It defies logic and common sense to suggest that a Claims Act claim, even if presented on behalf of a student, is an 'education record' or 'pupil record' within the purview of these exemptions. Just because a litigant has chosen to sue a school does not transmogrify the Claims Act claim into such a record. We therefore conclude the release of such a claim implicates neither FERPA nor its California counterpart." (*Id.* at p. 1507.)

■ Certainly the language of the statute, though broadly written, does not encompass every document that relates to a student in any way and is kept by the school in any fashion. A pupil record is one that "directly relates" to a student and is "maintained" by the school. We agree with the Supreme Court that the statute was directed at institutional records maintained in the normal course of business by a single, central custodian of the school. Typical of such records would be registration forms, class schedules, grade transcripts, discipline reports, and the like.

■ The Davis report, however, does not fall within that group. True, it identifies students by name and details actions taken by them and against them, some of which violated school policy and subjected them to discipline. However, the report was not directly related to the private educational

interests of the students. Its purpose was to investigate complaints of malfeasance allegedly committed by the highest administrator in the District.

The report was not something regularly done in the normal course of business, as illustrated by the fact it required a Board resolution to initiate. It also was not the type of report regularly maintained in a central location along with education records such as those described above in separate files for each student.

For all of the above reasons, we conclude the Davis report and its accompanying summaries were not pupil records within the meaning of Education Code sections 49061 and 49076. This conclusion, however, does not end the matter. We still must determine whether the Davis report was subject to disclosure under the Public Records Act.

IV

*Disclosure Under the Public Records Act*

The trial court noted it would have ordered the entire report disclosed if its analysis was confined to applying the test of the Public Records Act's catchall exception (§ 6255), but it concluded the exemption for personnel files precluded disclosure. (§ 6254, subd. (c).) This reasoning implies the court applied different tests under each provision to weigh the privacy interest against the public's interest in disclosure. The tests under the two statutes, however, are essentially the same. (*Teamsters Local 856 v. Priceless, LLC* (2003) 112 Cal.App.4th 1500, 1511 [5 Cal.Rptr.3d 847]; *Braun v. City of Taft* (1984) 154 Cal.App.3d 332, 347 [201 Cal.Rptr. 654].)

Thus, under either provision, a court determining whether personnel records should be disclosed first "must determine whether disclosure of the information would 'compromise substantial privacy interests; if privacy interests in given information are *de minimis* disclosure would not amount to a "clearly unwarranted invasion of personal privacy," [citation], . . . .' [Citation.]" (*Versaci v. Superior Court* (2005) 127 Cal.App.4th 805, 818 [26 Cal.Rptr.3d 92], original italics.)

Second, the court "must determine whether the potential harm to privacy interests from disclosure outweighs the public interest in disclosure." (*Versaci v. Superior Court, supra,* 127 Cal.App.4th at p. 818.) In weighing the competing interests, "we must determine 'the extent to which disclosure of the requested item of information will shed light on the public agency's performance of its duty.' [Citation.]" (*Id.* at p. 820.)

■ As mentioned above, we construe the Act's exemptions from its disclosure requirement narrowly. (Cal. Const., art. I, § 3, subd. (b), par. (2); *City of Hemet v. Superior Court* (1995) 37 Cal.App.4th 1411, 1425 [44 Cal.Rptr.2d 532].) The proponent of nondisclosure bears the burden to demonstrate a " ' "clear overbalance" ' " on the side of confidentiality. (*California State University v. Superior Court, supra,* 90 Cal.App.4th at p. 831.) We review both prongs of the exception.

### A. *Substantial privacy interest*

■ Public employees have a legally protected interest in their personnel files. (*Teamsters Local 856 v. Priceless, LLC, supra,* 112 Cal.App.4th at pp. 1512–1514.) We quote at length:

"The [Public Records Act (CPRA)] itself recognizes the right of privacy in one's personnel files by virtue of the exemption in section 6254, subdivision (c). The CPRA, with its privacy protection, is modeled upon the federal Freedom of Information Act (FOIA) and the federal judicial construction of that statute is useful in construing the CPRA. (*City of San Jose* [*v. Superior Court* (1999) 74 Cal.App.4th 1008,] 1016 [88 Cal.Rptr.2d 552].)

"Federal cases construing the similar federal provision have found a reasonable expectation of privacy in one's personnel files. 'A person's interest in preserving the confidentiality of sensitive information contained in his personnel files has been given forceful recognition in both federal and state legislation governing the recordkeeping activities of public employers and agencies. [Citations.]' (*Detroit Edison Co. v. NLRB* (1979) 440 U.S. 301, 319, fn. 16 [59 L.Ed.2d 333, 99 S.Ct. 1123] [noting that federal Privacy Act bans unconsented disclosure of employee records].)

"In *United States Department of State v. Washington Post Co.* (1982) 456 U.S. 595 [72 L.Ed.2d 358, 102 S.Ct. 1957], the Supreme Court made it apparent that items to be protected within personnel files are not just the intimate private details of personal decisions. The court stated that the intent of Congress in enacting the exemption was that it: '. . . "cover detailed Government records on an individual which can be identified as applying to that individual." [Citation.] When the disclosure of information which applies to a particular individual is sought from Government records, courts must determine whether release of the information would constitute a clearly unwarranted invasion of that person's privacy.' (*Id.* at p. 602.)

"In discussing the general attributes of a personnel file, the United States Supreme Court has stated that an individual's personnel file generally contains ' "vast amounts of personal data," ' including 'where he was born, the

names of his parents, where he has lived from time to time, his high school or other school records, results of examinations, evaluations of his work performance.' The court noted that access to personnel files is 'drastically limited . . . only to supervisory personnel directly involved with the individual. . . .' (*Department of the Air Force v. Rose* (1976) 425 U.S. 352, 369, 377 [48 L.Ed.2d 11, 96 S.Ct. 1592] [concerning records of Air Force cadets whose military education was publicly financed].) The federal [and state] courts recognize that information from a personnel file that applies to a specified individual raises significant privacy concerns." (*Teamsters Local 856 v. Priceless, LLC, supra*, 112 Cal.App.4th at pp. 1514–1515, fn. omitted.)

Certainly, Morris has a significant privacy interest in his personnel file, including the Davis report. We turn to the next prong of the test.

B. *Whether the potential harm to privacy interests from disclosure outweighs the public interest in disclosure*

Without doubt, the public has a significant interest in the professional competence and conduct of a school district superintendent and high school principal. It also has a significant interest in knowing how the District's Board conducts its business, and in particular, how the Board responds to allegations of misconduct committed by the District's chief administrator. We thus must determine whether the potential harm disclosure of the report could cause to Morris's privacy interest outweighs the public's interest in disclosure.

 "[T]he constitutional right to privacy must be balanced against the public's interest in its business in much the same way that the courts have sought accommodation of the reputational interests of the individual and the United States Constitution's First Amendment's protection of press freedoms. (See, e.g., *New York Times Co. v. Sullivan* (1964) 376 U.S. 254 [11 L.Ed.2d 686, 84 S.Ct. 710].) Although one does not lose his right to privacy upon accepting public employment, the very fact that he is engaged in the public's business strips him of some anonymity." (*Braun v. City of Taft, supra*, 154 Cal.App.3d at p. 347.)

In *Chronicle Pub. Co. v. Superior Court* (1960) 54 Cal.2d 548 [7 Cal.Rptr. 109, 354 P.2d 637] (*Chronicle Publishing*), our Supreme Court concluded that complaints confidentially made to the State Bar regarding an attorney's professional conduct, and the investigations of those complaints, that do not result in public or private discipline, are confidential and not subject to disclosure. The rule serves two public interests. First, it protects the proper functioning of the bar's disciplinary system by ensuring people may file complaints without risk of creating a publicly accessible record and being subject to a libel action. (*Id.* at pp. 566, 568.)

Second, the rule of nondisclosure protects individual members of the bar from unwarranted attacks and accusations. (*Chronicle Publishing, supra*, 54 Cal.2d at p. 566.) "[The attorney] is not exposed to publicity where groundless charges are made. . . . The fact that a charge has been made against an attorney, no matter how guiltless the attorney might be, if generally known, would do the attorney irreparable harm even though he be cleared by the State Bar." (*Id.* at p. 569.)

Courts have applied the rule of *Chronicle Publishing* to requests under the Public Records Act for personnel records maintained by a public employer (*American Federation of State etc. Employees v. Regents of University of California* (1978) 80 Cal.App.3d 913 [146 Cal.Rptr. 42]), and, more recently, to personnel records maintained by a school district on a district employee. (*Bakersfield City School Dist. v. Superior Court* (2004) 118 Cal.App.4th 1041 [13 Cal.Rptr.3d 517] (*Bakersfield*).) In that case, a newspaper petitioned for disclosure of complaints and disciplinary records of a school district employee. The trial court prevented disclosure of records the court concluded were not substantial in nature and there was no reasonable cause to believe the complaints were well founded. It granted the petition, however, as to complaints regarding one incident the court described as sexual-type conduct, threats of violence, and violence. The court found those complaints were substantial in nature and there was reasonable cause to believe they were well founded. (*Id.* at pp. 1043–1044.)

 The school district appealed, and the Court of Appeal affirmed. "In evaluating whether a complaint against an employee is well-founded within the context of section 6250 et seq., both trial and appellate courts, working with little or nothing more than written records, are ill-equipped to determine the veracity of the complaint. The courts instead, both originally and upon review, are required to examine the documents presented to determine whether they reveal sufficient indicia of reliability to support a reasonable conclusion that the complaint was well founded. The courts must consider such indicia of reliability in performing their ultimate task of balancing the competing concerns of a public employee's right to privacy and the public interest served by disclosure." (*Bakersfield, supra*, 118 Cal.App.4th at p. 1047.)

Here, the trial court relied upon these cases to preclude release of the Davis report, but these cases are distinguishable. None of them dealt with a public official in the position of Morris who, under the *Sullivan* standard, had a significantly reduced expectation of privacy in the matters of his public employment. The potential injury here is to his reputation, but as a public official, he knew his performance could be the subject of public, "vehement, caustic, and sometimes unpleasantly sharp attacks . . . ." (*New York Times*

*Co. v. Sullivan, supra,* 376 U.S. at p. 270.) The constitutional protections of free speech, press, and, in this state, access to public agency records to observe the conduct of public business are not forfeited by the risk of injury to official reputation. (*Id.* at pp. 272–273.)

Here, members of the public were greatly concerned about the behavior of the city's high school superintendent and his governing elected board in responding to their complaints. Indeed, from the public's viewpoint, the District appeared to have entered into a "sweetheart deal" to buy out the superintendent from his employment without having to respond to the public accusations of misconduct. The public's interest in judging how the elected board treated this situation far outweighed the Board's or Morris's interest in keeping the matter quiet. Because of Morris's position of authority as a public official and the public nature of the allegations, the public's interest in disclosure outweighed Morris's interest in preventing disclosure of the Davis report.

We reviewed the report, but because of Morris's status as a public official, we applied a lesser standard of reliability than we otherwise would for a nonpublic official under the rule of *Bakersfield.* Although the investigator determined most of the allegations were not sufficiently reliable, we could not conclude the allegations were so unreliable the accusations could not be anything but false. The report exonerated Morris of all serious allegations of misconduct except those relating to outbursts of anger. In this circumstance, the public's interest in understanding why Morris was exonerated and how the District treated the accusations outweighs Morris's interest in keeping the allegations confidential.

We note, however, that the public's interest in viewing the Davis report is not furthered by knowing the indentities of any of the students, parents, staff members, or faculty members interviewed or mentioned in the report. Nothing in the record indicates these persons are public officials such as Morris. Knowing their identities does not help the public understand how the Board responded to the allegations involving Morris. We will thus direct that all names, home addresses, phone numbers, and job titles for such persons be redacted before the report is released. (See, e.g., *Teamsters Local 856 v. Priceless, LLC, supra,* 112 Cal.App.4th at pp. 1521–1523.)

Because of our conclusion, we need not address petitioner's remaining arguments.

## DISPOSITION

The petition for extraordinary writ is granted. The District shall release to BRV the Davis report in its entirety (consisting of approximately 257 pages in total, including the letter detailing Davis's findings and opinions, the interview summaries, any memoranda written by Davis, and her interview notes), subject first to redacting the names, home addresses, phone numbers, and job titles of all persons mentioned in the report other than Morris or elected members of the District's Board. Costs and reasonable attorney fees in this proceeding are awarded to petitioner. (§ 6259, subd. (d).)

Except as may otherwise be ordered by the California Supreme Court, the writ shall become effective, and release of the report is required, 30 days following issuance by this court of the remittitur.

Morrison, J., and Butz, J., concurred.

A petition for a rehearing was denied October 26, 2006, and the opinion was modified to read as printed above. The petition of real parties in interest for review by the Supreme Court was denied December 13, 2006, S147908.