Filed 7/23/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| LOS ANGELES UNIFIED SCHOOL DISTRICT et al., | B251693 |
| Petitioners, | (Los Angeles County Super. Ct. No. BS139828) |
| v. | |
| THE SUPERIOR COURT OF LOS ANGELES COUNTY, | |
| Respondent; | |
| LOS ANGELES TIMES COMMUNICATIONS LLC, | |
| Real Party in Interest. | |

ORIGINAL PROCEEDINGS in mandate. James C. Chalfant, Judge. Petitions granted in part and remanded.

Altshuler Berzon, Jeffrey B. Demain, Jonathan Weissglass, Eric P. Brown; Holguin, Garfield, Martinez & Quiñonez and Jesús Quiñonez for Petitioner United Teachers Los Angeles.

Office of the General Counsel Los Angeles Unified School District, Alexander A. Molina; Littler Mendelson, Barrett K. Green and Maggy M. Athanasious for Petitioner Los Angeles Unified School District.

No appearance for Respondent.

Los Angeles Times Communications LLC, Jeff Glasser; Davis Wright Tremaine, Kelli L. Sager and Rochelle L. Wilcox for Real Party in Interest.

## INTRODUCTION

When it comes to educating children, few things are more controversial than standardized tests. And few things generate more conflict than how, or even if, teachers should try to improve their students' performance on such tests. But by law, school districts must establish standards of expected pupil achievement, and teachers are evaluated and assessed in regards to their students' progress. Whatever the merits of standardized tests, they are part of the present educational environment in which students, teachers, and parents live.

The Los Angeles Unified School District (the District or LAUSD) has developed a statistical model designed to measure a teacher's effect on his or her students' performance in the California Standards Tests (CST). This model yields a result—known as an Academic Growth Over Time (AGT) score—which is derived by comparing students' actual CST scores with the scores the students were predicted to achieve based on a host of sociodemographic and other factors. These AGT scores are calculated at various levels—by individual teacher, by grade, by school, and by subject matter. The District releases most of these scores to the public. Among other things, the District releases AGT scores for over 650 schools, as well as AGT scores for every grade level and subject matter. In addition, the District has released AGT scores for individual teachers—but with their names redacted.

This writ proceeding raises the question of whether the AGT scores of each teacher, identified by name,[1] must be released under the California Public Records Act (CPRA; Gov. Code, § 6250 et seq.).[2] In response to a petition for writ of mandate brought by the Los Angeles Times (Times), the trial court ruled the District is required to produce these unredacted AGT scores, as well as the location codes which identify the school to which each teacher is assigned. The District and United Teachers Los Angeles

---

[1]     As used in this opinion, the term "by name" includes a teacher's proper name or any other identifying information. The term "unredacted AGT score" refers to a score that is linked to an individual teacher by name.

[2]     Undesignated statutory references are to the Government Code.

(UTLA) have each filed writ petitions in this court, challenging the trial court's ruling. They claim the court erred, arguing that the unredacted AGT scores are exempt from disclosure under two sections of the CPRA—the "privacy" exemption in section 6254, subdivision (c) and the "catch-all" exemption in section 6255.

We hold that the unredacted AGT scores are exempt from disclosure under the catch-all exemption in section 6255 because the public interest served by not disclosing the teachers' names clearly outweighs the public interest served by their disclosure. Accordingly, we grant the separate petitions for writ of mandate filed by the District and UTLA to the extent they challenge the trial court's ruling requiring disclosure by name or identifying characteristics of each teacher with his or her AGT score. However, we remand to the trial court for further proceedings regarding disclosure of the location codes.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. *The District's AGT Metric*

Under the Stull Act (Ed. Code, § 44660 et seq.), school districts are required to establish standards of expected student achievement in each area of study, and to evaluate teacher performance as it relates to the progress of students toward reaching those standards. (See §§ 44662 & 44664 [requiring school districts to regularly evaluate and assess teacher performance and to meet with teachers who receive an unsatisfactory rating].) Working with a research center at the University of Wisconsin-Madison, and after obtaining input from various other experts and interested parties, the District has developed the AGT metric in an attempt to measure the effect of its teachers on student standardized test (i.e., CST) performance. The AGT scores are based on a "value-added" methodology and are derived by comparing students' *predicted* CST scores with their *actual* scores. The predicted score is based on students' past performance on the CST, as well as on a host of sociodemographic and other factors, such as gender, race, English language learner status, and special education status. An AGT score is assigned using a

five-point scale reflecting student performance: (1) far below predicted, (2) below predicted, (3) within the predicted range, (4) above predicted, and (5) far above predicted.

Through an official website, the District makes available to the public AGT scores for individual schools, as well as for every grade within those schools. The website also provides AGT scores for each school by subject matter. Thus, for example, one can go online and see that, in the 2011-2012 school year, third grade students at a certain elementary school received a 3.7 (on the five-point scale) in math, fourth grade students at that same school received a 3.4 in math, and fifth grade students received a 4.2 in math. One can also see scores at that school broken down by gender, race, English language learner status and other variables.

### 2.      *The Times' CPRA Requests*

Starting in around 2009, before the District had developed the AGT metric, the Times began submitting CPRA requests to the District to obtain various scores relating to student and teacher performance. After some back-and-forth discussion, the District ultimately complied with the Times' requests and provided student test data, along with information that would enable the Times to connect student scores to their individual teachers. Beginning in August 2010, the Times published a series of articles concerning the effectiveness of District teachers in improving student performance on standardized tests. Based on the information obtained from the District, the newspaper developed its own value-added metric to assess teacher performance. In 2010, and again in 2011, the Times published its value-added scores for thousands of individual teachers, who were identified by name.

In April 2011, the Times made another CPRA request, seeking the AGT scores for the 2009-2010 school year, the only year for which AGT scores had been prepared at that time. The District denied the request, claiming the AGT database was still in preliminary draft form and was therefore exempt from disclosure under the CPRA's "preliminary

4

drafts" exemption. (§ 6254, subd. (a).)[3] The District noted that teacher-identifying AGT data for the 2011-2012 school year would be part of the teacher evaluation process in the future, at which time it would be exempt under the CPRA's personnel records exemption. (§ 6254, subd. (c).) Although the District denied the CPRA request, it provided some AGT data. However, it was limited to aggregate teacher scores on a school-wide basis, and individual—but anonymous—scores for teachers.[4]

In October 2011, the Times again made a CPRA request, this time seeking teacher AGT scores for the 2010-2011 school year that were being distributed to teachers that month, as well as teacher AGT scores for the 2009-2010 school year. The District responded, claiming that (1) the 2009-2010 scores were exempt from disclosure under the preliminary drafts, personnel records, and catch-all exemptions, and (2) the 2010-2011 scores were exempt under both the personnel records and catch-all exemptions.[5] The District said it would be willing to provide teacher AGT scores for the 2010-2011 school year, but only after redacting the names of the teachers. While the additional redacted material allows one to ascertain the AGT score of "Teacher A," it does not reveal the classroom or the school in which Teacher A works. Thus, it does not allow one to directly compare his or her score with that of "Teacher B" in a different classroom in the same (or different) school.

---

[3] The CPRA's "preliminary drafts" exemption is not at issue in this writ proceeding.

[4] These redacted teacher scores did not include the location codes linking the unnamed teachers to the schools to which they were assigned. At some point in this process, the District expressed a willingness to provide the Times with these codes. However, for reasons that are not clear in the record, this never occurred.

[5] Under the personnel records exemption, public records that would otherwise be subject to disclosure under the CPRA are exempt from disclosure if they are "[p]ersonnel, medical, or similar files, the disclosure of which would constitute an unwarranted invasion of personal privacy." (§ 6254, subd. (c).) Under the catch-all exemption, a government agency may withhold disclosure of public records if it can show that "on the facts of the particular case the public interest served by not disclosing the record clearly outweighs the public interest served by disclosure of the record." (§ 6255.)

5

Finally, in August 2012, the Times submitted another CPRA request, seeking the 2011-2012 teacher AGT scores. The District denied the request, claiming disclosure was exempt under the personnel records and catch-all exemptions. It again agreed to provide teacher AGT scores with names redacted.

### 3.  *The District-UTLA Agreement*

In November 2012, the District and UTLA concluded an agreement regarding the use of AGT scores and other matters relating to the evaluation of teachers. The agreement provides that "[i]ndividual AGT scores (as distinguished from the school-level AGT results) are to be used solely to give perspective and to assist in reviewing the past CST results of the teacher, and shall neither form the basis for any performance objectives/strategies nor be used in the final evaluation."[6]

In addition, the District-UTLA agreement contains the following provision: "**Confidentiality of Individualized CST/AGT Test Results**:  CST/AGT scoring reports that are linked to names of individual employees shall be treated as a confidential personnel record, due in part to their use in the employee performance evaluation system. The District will defend that principle in court as the occasion arises."[7]

### 4.  *The Times' Lawsuit*

In October 2012, the Times initiated this litigation by petitioning the superior court for a writ of mandate under the CPRA, seeking the AGT scores of each teacher identified by name, and also the location codes indicating the schools to which each teacher was assigned. The District opposed the Times' petition on the grounds that the

---

[6]  Although the District-UTLA agreement raises questions about the extent to which teacher AGT scores can be used, the scores clearly play some role in the teacher evaluation process.

[7]  Public employment contracts themselves are not subject to the exemption provisions of sections 6254 or 6255. (§ 6254.8.)  And by itself, the "promise of secrecy cannot always shield a public record from disclosure." (*Versaci v. Superior Court* (2005) 127 Cal.App.4th 805, 821 (*Versaci*).)

information was exempt from disclosure under sections 6254 and 6255. In January 2013, the trial court granted UTLA's motion for leave to intervene. UTLA aligned itself with the District and relied on the same two CPRA exemptions.

In support of its opposition to the Times' writ petition, the District provided a declaration from its superintendent, John Deasy, who indicated that he had nearly three decades of experience in education (including as superintendent of schools in Maryland, Rhode Island, and Santa Monica-Malibu, California) before becoming head of the District. Superintendent Deasy expressed concerns that releasing unredacted teacher AGT scores would (1) spur unhealthy comparisons among teachers and breed discord in the workplace, leading to resentment, jealousy, bitterness and anger, and proving counterproductive and demoralizing to some teachers, (2) discourage recruitment of quality candidates and/or cause existing teachers to leave the District, (3) allow competing schools to steal away the District's teachers with high AGT scores, (4) disrupt a balanced assignment of the teaching staff — which is essential to the operations of the District — because parents would battle to ensure that their own children be assigned to the highest-performing teachers, and away from the lower-rated teachers, (5) undermine the authority of teachers with low AGT scores because parents and students alike would lose confidence in them, undercutting their ability to receive and accept guidance and perform their jobs, and (6) adversely affect the teacher disciplinary process because teachers subject to such proceedings could compare their AGT results with those of other teachers.

The Times objected to many of the statements in Superintendent Deasy's declaration. Most objections were overruled.[8] At the hearing on the Times' petition and in its written ruling, the court indicated it had considered and given weight to at least

---

[8] The trial court sustained objections only to the statements opining that release of unredacted scores would (a) lead to resentment, jealousy, bitterness and anger, and prove counterproductive and demoralizing to some teachers, (b) undermine the authority of teachers with low AGT scores, undercutting their ability to receive and accept guidance and perform their jobs, and (c) allow competing schools to steal away the District's

some of the superintendent's concerns.[9]

In support of its separate opposition to the Times' petition, UTLA submitted a declaration from Dr. Jesse Rothstein, a labor economist who teaches at the University of California, Berkeley, and studies education policy, with a particular emphasis on value-added modeling. Among other things, Dr. Rothstein explained that value-added models are highly unstable. He observed that value-based accountability schemes for teachers were too new to have produced much evidence regarding their effect. Dr. Rothstein also stated that "[t]here has been basically no research on the consequences of releasing VA [value-added] scores publicly," which he claimed was due in part to the fact that "few if any experts in the area see this as a good policy."

### 5. The Trial Court's Ruling

After hearing argument from all parties, the trial court issued a comprehensive 26-page decision. It concluded that AGT scores linked to each teacher's name were not exempt from disclosure under the CPRA and granted the Times' petition.

At the outset, the court agreed with the District and UTLA that the AGT scores were part of the teachers' personnel or other similar file, which is a prerequisite to consideration under the privacy exemption. (§ 6254, subd. (c).) It then noted that the evidence showed "a real concern of embarrassment and jealousy from disclosure of the [AGT] scores." And it acknowledged that any stigma attached to a low score could be heightened because the District's AGT metric had the imprimatur of the LAUSD and would carry substantial weight with the public and the parents. The court concluded "[t]he District and UTLA present considerable evidence of teacher embarrassment,

---

teachers with high AGT scores. Objections to the remainder of Superintendent Deasy's declaration were overruled.

[9] How much weight was given to Superintendent Deasy's declaration is unclear. As the court candidly remarked, "You can see from the tentative that I didn't really know how to handle Mr. Deasy's declaration so I referred to it as his concerns. Whether they qualify as non-speculative, I wasn't sure, frankly."

jealousy, and unhealthy comparisons which may result from disclosure." It described these as "serious harms."

However, the court did not believe these concerns were sufficient to tip the balance in favor of nondisclosure. It found that the teachers had no reasonable expectation of privacy with respect to their AGT scores. And it concluded that, even assuming the teachers had a reasonable expectation of privacy in their scores, their privacy interests do not "clearly outweigh" the public interest in disclosure.[10]

The court opined the public has a strong interest in disclosure of teacher AGT scores because the scores are compiled at taxpayer expense; they are intended to provide an objective measure of student performance and teacher success; the public has a general interest in all educational issues; and standardized testing and objective evaluation of teacher performance are particularly topical for educators, parents, students, and the general public. The court concluded "there should be an array of information available to a parent and the public concerning student performance . . ." and "teacher scores are but one tool in the parent toolbox . . . ."

With respect to the concerns expressed by Dr. Rothstein about reliability and public policy, as well as Superintendent Deasy's opinions regarding the detrimental effect on the District's ability to do its job, the court stated, "I personally don't think disclosure is good public policy. My personal beliefs are not relevant." It went on to say, "[t]he simple answer is that the court does not set public policy, good or bad" and noted that the Legislature could amend the Education Code to preclude disclosure of teacher AGT scores.

In the trial court, the focus was primarily on the privacy exemption issue, but the catch-all exemption was also considered and discussed. The court ruled that the District and UTLA had not met their burden of showing they were entitled to an exemption under

---

[10] The statutory language in section 6254, subdivision (c) uses the term "unwarranted invasion of personal privacy." The term "clearly outweighs" is used in section 6255 (the catch-all provision). Nevertheless, each process requires consideration of almost exactly the same elements. (*Braun v. City of Taft* (1984) 154 Cal.App.3d 332, 345 (*Braun*).)

either code section.  In granting the Times' writ petition, the court ordered the District to release "[t]he teachers' names with corresponding pseudo-identification numbers and location codes for the teachers' school assignments, that connect all Los Angeles Unified School District teachers with their [AGT] scores for the academic years 2009 [through] 2012."

### 6.  The Writ Petitions by UTLA and the District

The District and UTLA petitioned this court for relief, each of them filing separate writ petitions challenging the trial court's judgment.  After this court's initial summary denial of the petitions, the Supreme Court granted the separate petitions for review by the District and UTLA and transferred the matters back to this court with directions to issue an order to show cause.  We consolidated the two proceedings, issued an order to show cause, received briefing from the parties, and heard oral argument.

Soon after oral argument in this case, our Supreme Court issued its opinion in *Long Beach Police Officers Assn. v. City of Long Beach* (2014) 59 Cal.4th 59 (*City of Long Beach*).)  Following a request by the Times, we invited and received supplemental letter briefs from all parties discussing the significance of the *City of Long Beach* opinion on the issues raised in the instant case.

### STANDARD OF REVIEW

Pursuant to section 6259, subdivision (c), a trial court order under the CPRA, either directing disclosure of records by a public official or supporting a decision by a public official refusing disclosure, is immediately reviewable by a writ petition to the appellate court.  (*CBS Broadcasting Inc. v. Superior Court* (2001) 91 Cal.App.4th 892, 905-906 .)  We review the trial court's ruling de novo, although factual findings made by the trial court will be upheld if based upon substantial evidence.  (*Michaelis, Montanari & Johnson v. Superior Court* (2006) 38 Cal.4th 1065, 1072 (*Michaelis*).)  Interpretation of the CPRA and its application to undisputed facts present questions of law subject to de novo appellate review.  (*CBS Broadcasting, supra*, at p. 906.)  And when it comes to

balancing various interests under the CPRA, while we accept the trial court's express and implied factual determinations if supported by the record, "we undertake the weighing process anew." (*County of Santa Clara v. Superior Court* (2009) 170 Cal.App.4th 1301, 1323 (*County of Santa Clara*).)

## DISCUSSION

### I. Constitutional Provisions and the Statutory Scheme

A. Overview

Openness in government is essential to the functioning of a democracy. "Implicit in the democratic process is the notion that government should be accountable for its actions. In order to verify accountability, individuals must have access to government records. Such access permits checks against the arbitrary exercise of official power and secrecy in the political process." (*International Federation of Professional & Technical Engineers, Local 21, AFL-CIO v. Superior Court* (2007) 42 Cal.4th 319, 328-329 (*International Federation*).)

In 1968, the Legislature enacted the CPRA to clarify the scope of the public's right to inspect records. (*County of Los Angeles v. Superior Court* (2000) 82 Cal.App.4th 819, 825 (*County of Los Angeles*).) The CPRA "'replaced a hodgepodge of statutes and court decisions relating to disclosure of public records.' [Citations.]" (*Los Angeles Unified School District v. Superior Court* (2007) 151 Cal.App.4th 759, 765.) The statutory scheme "'was enacted for the purpose of increasing freedom of information by giving members of the public access to information in the possession of public agencies.' [Citation.]" (*County of Santa Clara, supra*, 170 Cal.App.4th at pp. 1319-1320.) The Legislature declared that "access to information concerning the conduct of the people's business is a fundamental and necessary right of every person in the state." (§ 6250.) The general policy favors disclosure, and all public records are subject to disclosure unless the CPRA provides otherwise. (*County of Santa Clara, supra*, at p. 1320.)

The CPRA was modeled after the federal Freedom of Information Act (FOIA; 5 U.S.C § 552 et seq.) (*Times Mirror Co. v. Superior Court* (1991) 53 Cal.3d 1325, 1338

(*Times Mirror*).)  FOIA's "core purpose" is to contribute significantly to public understanding of government activities.  (*Department of Defense v. FLRA* (1994) 510 U.S. 487, 495 (*Dept. of Defense*).)  Accordingly, federal "legislative history and judicial construction of the FOIA . . . 'serve to illuminate the interpretation of its California counterpart.' [Citations.]"  (*Times Mirror, supra*, at p. 1338.)

In 2004, California voters endorsed the policy set forth in the CPRA by approving Proposition 59, which amended the state Constitution to explicitly recognize the "right of access to information concerning the conduct of the people's business" and to provide that "the writings of public officials and agencies shall be open to public scrutiny." (Cal. Const., art. I, § 3, subd. (b)(1).)


B.  Exemptions — Competing Private and Public Interests

Fundamental rights, however, can sometimes conflict.  The right of access to public records under the CPRA is not absolute.  (*Copley Press, Inc. v. Superior Court* (2006) 39 Cal.4th 1272, 1282.)  The California Constitution contains an explicit right of privacy that operates against private and governmental entities.  (Art. I, § 1; *Gilbert v. City of San Jose* (2003) 114 Cal.App.4th 606, 613.)  In enacting the CPRA, the Legislature was "mindful of the right of individuals to privacy."  (Gov. Code, § 6250.) By the same token, constitutional privacy interests are not absolute, either.  They must be balanced against other important interests.  (*Gilbert, supra*, at p. 613.)

The CPRA enumerates a "'number of exemptions that permit government agencies to refuse to disclose certain public records.' [Citation.]"  (*County of Santa Clara, supra*, 170 Cal.App.4th at p. 1320.)  Specific exemptions apply where the public interest in disclosure may be outweighed by various public or private interests.  (§ 6254.) In addition to these specific exemptions, the Legislature added a "catch-all" provision which allows a government agency to withhold records if it can demonstrate that, on the facts of a particular case, the public interest in nondisclosure outweighs the public interest in disclosure.  (§ 6255, subd. (a); *County of Santa Clara, supra*, at pp. 1320-1321.)  In general, however, all public records are subject to disclosure unless the Legislature has

12

expressly provided to the contrary. (*Williams v. Superior Court* (1993) 5 Cal.4th 337, 346.) Since disclosure is favored, the exemptions are narrowly construed. (Cal. Const., art. I, § 3, subd. (b)(2); *Board of Trustees of California State University v. Superior Court* (2005) 132 Cal.App.4th 889, 896.) Indeed, the constitutional provision itself states, "A statute, court rule, or other authority . . . shall be broadly construed if it furthers the people's right of access, and narrowly construed if it limits the right of access." (Cal. Const., art. I, § 3, subd. (b)(2).) An agency opposing disclosure bears the burden of proving that an exemption applies. (*Board of Trustees, supra*, at p. 896.)

### C. Specific Exemptions Applicable to the Instant Case

Here, we are concerned with two possible exemptions. The first is the privacy exemption. Pursuant to section 6254, subdivision (c), disclosure of records is not required if they are "personnel, medical, or similar files, the disclosure of which would constitute an unwarranted invasion of personal privacy." In the trial court, considerable dispute arose regarding the nature of the AGT scores and whether documents containing them reflected "personnel or similar files." The term "similar files" has been interpreted to "have a broad, rather than a narrow, meaning." (*Department of State v. Washington Post Co.* (1982) 456 U.S. 595, 600.) They need not contain intimate details or highly personal information. They may simply be government records containing "information which applies to a particular individual."[11] (*Id.* at p. 602.)

The question remains, however, whether disclosure of an AGT score tied to a teacher's name invades his or her right to privacy; and, if so, whether such invasion is unwarranted under the circumstances. In reaching a conclusion on this issue, a court must balance the public's interest in disclosure against the privacy right that the exemption is designed to protect. (*U.S. Dept. of Justice v. Reporters Committee* (1989)

---

[11] The records in question here clearly contain information about the AGT scores of particular teachers. The trial court assumed these records fall within the parameters of section 6254, subdivision (c).

13

489 U.S. 749, 776 (*Reporters Committee*).) Determining the proper balance involves two fundamental, yet competing, interests: (1) prevention of secrecy in government, and (2) protection of individual privacy. (*City of San Jose v. Superior Court* (1999) 74 Cal.App.4th 1008, 1017 (*City of San Jose*).)

The second exemption is the catch-all provision set forth in section 6255, which allows a government agency to withhold records if it can demonstrate that "on the facts of the particular case the public interest served by not disclosing the record clearly outweighs the public interest served by disclosure of the record." The catch-all exemption "contemplates a case-by-case balancing process, with the burden of proof on the proponent of nondisclosure to demonstrate a clear overbalance on the side of confidentiality." (*Michaelis, supra*, 38 Cal.4th at p. 1071.) Where the public interest in disclosure of the records is not outweighed by the public interest in nondisclosure, courts will direct the government to disclose the requested information. (*CBS, Inc. v. Block* (1986) 42 Cal.3d 646 (*Block*).) Conversely, when the public interest in nondisclosure clearly outweighs the public interest in disclosure, refusal to release records will be upheld. (*Times Mirror, supra*, 53 Cal.3d at p. 1325; *Wilson v. Superior Court* (1996) 51 Cal.App.4th 1136, 1141 (*Wilson*).)

Exemptions under either section require the court to engage in a balancing test. Under section 6254, subdivision (c), the court balances the public interest in disclosure against the individual's interest in privacy. Under section 6255, the court balances the public interest in disclosure against the public interest in nondisclosure. Since both exemptions require consideration of the public interest, we next consider what is meant by that term.

## II. As Used in the CPRA, What Does "Public Interest" Mean?

### A. The Nature of a Public Interest

The CPRA does not define "public interest" — understandably so, as the term itself is not only broad but is based upon innumerable variables, and is subject to change over time. Yet, in cases such as this, courts are called upon to determine what "public

14

interest" means, and how to apply it to the circumstances.[12]  We start with the safe assumption that a public interest is not the same as a private interest.  Otherwise, the adjectives "public" and "private" would be unnecessary.  It follows, therefore, that just because a member of the public has an interest in something does not necessarily make that interest one of public concern.

Courts have struggled with a definition, in large part because the analysis is so fact specific.  Some have said that defining what issues raise a public concern "'amounts to little more than a message to judges and attorneys that no standards are necessary because they will, or should, know a public concern when they see it.'  [Citations.]"  (*Rivero v. American Federation of State, County and Municipal Employees, AFL-CIO* (2003) 105 Cal.App.4th 913, 929.)  Other courts have doubted whether an all-encompassing definition can be provided.  (*Weinberg v. Feisel* (2003) 110 Cal.App.4th 1122, 1132.)

As noted, in considering the meaning of public interest under the CPRA, we may draw on the legislative history and judicial construction of the FOIA.  (*San Gabriel Tribune v. Superior Court* (1983) 143 Cal.App.3d 762, 772; *Wilson, supra*, 51 Cal.App.4th at pp. 1136, 1141.)  The FOIA was designed to ensure the government's activities are open to the "sharp eye of public scrutiny."  (*Reporters Committee, supra*, 489 U.S. at p. 774.)  The basic goal is to open agency action to the light of public review, with its core purpose designed to "'contribut[e] significantly to public understanding *of the operations or activities of the government*.'"  (*Id.* at p. 775.)  It follows, then, that "the only relevant public interest in the FOIA balancing analysis [is] the extent to which disclosure of the information sought would 'she[d] light on an agency's performance of

---

**12**     As the trial court correctly pointed out, courts do not set public policy.  That is a job for the Legislature.  Here, the Legislature has set a general policy in favor of disclosure of public records.  But it has explicitly charged the courts with balancing that policy against other important public and private interests that may weigh in favor of nondisclosure, based on the facts of the particular case.  (§ 6255.)  In this setting, any court decision regarding disclosure of AGT scores must necessarily be imbued with considerations of public policy.

its statutory duties' or otherwise let citizens know 'what their government is up to.' [Citation.]" (*Dept. of Defense, supra*, 510 U.S. at p. 497.)

California courts have followed the same approach. They have recognized the inherent tension between the public's right to know and society's interest in protecting private citizens (including public servants) from unwarranted invasions of privacy. (*Versaci, supra*, 127 Cal.App.4th at pp. 805, 822) One way to resolve this tension is to try to determine "the extent to which disclosure of the requested item of information will shed light on the public agency's performance of its duty." (*Teamsters Local 856 v. Priceless, LLC* (2003) 112 Cal.App.4th 1500, 1519 [disapproved on another point in *International Federation, supra*, 42 Cal.4th at p. 335].) When it comes to disclosing a person's identity under CPRA, the public interest which must be weighed is the interest in whether such disclosure "would contribute significantly to public understanding of government activities" and serve the legislative purpose of "'shed[ding] light on an agency's performance of its statutory duties.'" (*City of San Jose, supra*, 74 Cal.App.4th at pp. 1018-1019.) Where disclosure of names and addresses would not serve this purpose, denial of the request for disclosure has been upheld.[13] (*Id*. at p. 1019.)

B. Determining the "Weight" of a Public Interest in a Given Case

When the court does find a public interest, it must then determine its weight. "The existence and weight of the public interest in disclosure are conclusions derived from the nature of the information requested." (*Coronado Police Officers Assn. v. Carroll* (2003) 106 Cal.App.4th 1001, 1012-1013.) While, as a threshold matter, the

---

[13] *City of San Jose* involved disclosure of the identity of private individuals who had complained to a government agency. Here, of course, we are dealing with teachers who are employees of a school district. But even government employees have privacy rights and "on certain occasions, the public's right to disclosure must yield to the privacy rights of governmental agents." (*Versaci, supra*, 127 Cal.App.4th at p. 822.) "[O]ne does not lose his right to privacy upon accepting public employment . . . ." (*Braun, supra*, 154 Cal.App.3d at p. 347; see also *Forest Service Employees v. U.S. Forest Service* (9th Cir. 2008) 524 F.3d 1021, 1026 (*Forest Service*).)

16

records sought must pertain to the conduct of the people's business, "'[t]he *weight* of that interest is proportionate to the gravity of the governmental tasks sought to be illuminated and the directness with which the disclosure will serve to illuminate.'" (*Connell v. Superior Court* (1997) 56 Cal.App.4th 601, 616 (*Connell*).) Again, federal courts are in agreement. (*Hopkins v. U.S. Dept. of Housing & Urban Dev.* (2d Cir. 1991) 929 F.2d 81, 88 ["disclosure of information affecting privacy interests is permissible only if the information reveals something *directly* about the character of a government agency or official"].)

The motive of the particular requester in seeking public records is irrelevant (§ 6257.5), and the CPRA does not differentiate among those who seek access to them. (*County of Santa Clara, supra*, 170 Cal.App.4th at p. 1324.) Moreover, the purpose for which the requested records are to be used is likewise irrelevant. (*Connell, supra*, 56 Cal.App.4th at pp. 616-617.) "[T]he question instead is whether disclosure serves [a] *public* [purpose]." (*County of Santa Clara, supra*, at p. 1324.) "'What is material is the *public* interest in disclosure, not the private interest of a requesting party . . .' [Citations.]" (*Connell, supra*, at pp. 616-617.) Thus, in assigning *weight* to the public interest in disclosure, courts must look not only to the nature of the information requested, but also how directly the disclosure of that information contributes to the public's understanding of government. (*Humane Society of U.S. v. Superior Court* (2013) 214 Cal.App.4th 1233, 1268 (*Humane Society*); see also *Connell, supra*, at p. 616.)

Moreover, for the public interest to carry weight, it must be more than "hypothetical" or "minimal." (*County of Santa Clara, supra*, 170 Cal.App.4th at pp. 1323-1324.) Where a requester has an alternative, less intrusive means of obtaining the information sought, the public interest in disclosure is minimal. (*County of Santa Clara, supra*, at p. 1324; *City of San Jose, supra*, 74 Cal.App.4th at p. 1020.)

With the above principles in mind, we look to whether the records sought by the Times are exempt from disclosure.

17

*III. Are the Records Containing the AGT Scores of Individual Teachers Identified by Name Exempt from Disclosure Under Section 6255?*

We begin with the catch-all exemption in section 6255.  Preliminarily, we note that the term "teacher AGT scores," which has been used frequently throughout the case, may itself lead to some ambiguity.  The issue here is not "teacher AGT *scores*."  The issue is "*a* teacher's AGT *score*."  After all, the District has agreed to disclose "teacher AGT scores."  It has provided them *en masse* to the Times.  The public and the newspaper can readily discover the AGT scores for all teachers across the District in any given year.  The District and UTLA object to disclosing the AGT score of each teacher *by name*.  That is the narrow issue in dispute.

The trial court found a strong public interest in disclosure of "teacher AGT scores"—not only because they are compiled at taxpayer expense but because they reflect the performance of students and are intended to provide an objective measure of student performance and teacher success.  Regardless of the debate over their accuracy and reliability, AGT scores are designed and intended to assess teacher effectiveness. As such, they are an attempt to "shed light" on how the District is doing its job.[14]  There can be little doubt that a public interest exists in "teacher AGT scores" as a whole.  The question is whether the scores linked to individual teachers by name shed light on the District's performance beyond that shed by the scores without the names; and, if so, whether that further light is minimal, hypothetical, or outshined by other interests.

To find answers under section 6255, we employ a three-part test:  (1) We determine if there is a public interest served by nondisclosure of the records; (2) If so, we determine if a public interest is served by disclosure of the records; and (3) If both are found, we determine whether (1) clearly outweighs (2).  If it does not, the records are disclosed.  In applying this test, we keep in mind the public policy favoring disclosure of

[14]    The parties, especially UTLA, spent much time and effort arguing about the validity of AGT scores.  But that question is not squarely before us and is tangential to the weighing of interests required in this proceeding.  We do not address, much less resolve, it here.

records dealing with the public's business, the policy of construing exemptions narrowly, and the fact that the burden is on the party resisting disclosure to prove an exemption applies.

    A.  <u>The Public Interest in Nondisclosure</u>

        *1. The Deasy Declaration*

As noted above, the trial court was unsure what to make of the declaration of LAUSD's Superintendent Deasy, believing that many of his concerns were speculative. Uncertainty regarding the nature and weight of the proof required to support one's position under the CPRA pervades much of the case law in this area. Partly, no doubt, this is because of the need to ascertain what will happen if the records in question are produced, which in turn requires some degree of prediction of human behavior. And partly it is because of the nature of the proceedings—i.e., a writ proceeding in which the usual process of discovery, motions, and trial are telescoped.

Superintendent Deasy identified various harms he believed would occur if teachers' names tied to their AGT scores were disclosed. As noted above, the trial court considered them, but was unsure if they were "non-speculative." But where a party is trying to show a public interest in nondisclosure, by its very nature it is trying to prove how people will respond to something that has not occurred; it is trying to show that if previously secret records are made public, something bad will happen. It is no wonder requesters have often argued that the parade of horribles predicted by those resisting disclosure is speculative. (*Block, supra*, 42 Cal.3d at pp. 646, 652 [claim that revealing applications for concealed weapon permits would increase licensees' vulnerability "conjectural at best"]; *California State University, Fresno Assn., Inc. v. Superior Court* (2001) 90 Cal.App.4th 810, 835 [evidence that disclosing the names of donors who obtained licenses for luxury suites at campus arena would have a chilling effect on future donations was speculative and inadmissible]; *New York Times Co. v. Superior Court* (1990) 218 Cal.App.3d 1579, 1586 [the "record contains no evidence" supporting agency's claim that names and addresses of customers who exceeded their water

allocation would expose them to verbal or physical harassment] .)  This argument appears to have carried the day in the trial court, which concluded that virtually all of the District's arguments regarding the catch-all exemption were "supported only by speculation, not evidence."

But experts often opine on what they predict will be the consequences of proposed actions, and expert opinions can be admissible in this setting.  In *Humane Society, supra*, 214 Cal.App.4th at page 1233, an animal advocacy group petitioned for disclosure of records concerning ongoing research relating to a proposed voter initiative.  The Regents of the University of California opposed disclosure under section 6255 on the grounds that releasing the records would be contrary to the public interest by making it more difficult to conduct future research studies.  The Regents presented the testimony of the expert who directed the study.  He expressed his opinions, based upon his years of experience doing research, about the harm that would be caused by release of the requested information.  The Court of Appeal pointed out that given the expert's experience, it was not speculation for him to opine about what would occur if the records were made public.  The court could receive the opinion and consider it in its section 6255 balancing test.  (*Humane Society, supra*, at p. 1258.)

Here, there can be no doubt that Superintendent Deasy qualifies as an expert in his field, with extensive experience in teaching and administration, dealing with schools and teachers.  Reasonable minds may differ on the weight to be given his opinions, and some of his predictions may be more compelling than others.  But they clearly demonstrate a legitimate concern for what may occur if the names of teachers are released along with their AGT scores.  It seems logical that the unredacted scores could spur unhealthy comparisons among teachers and breed discord in the workplace, discourage recruitment of quality candidates and/or cause existing teachers to leave the District, disrupt the balance of classroom assignments (see below), and adversely affect the disciplinary process.  Clearly, the public has an interest in avoiding these consequences in its schools.

20

### 2. Common Sense and Human Experience

In the context of CPRA litigation, courts may be called upon to make judgments with a paucity of "hard" evidence. In doing so, they may be required to rely on commonly understood general human behavior. (*Humane Society, supra*, 214 Cal.App.4th at p. 1259.) Courts have not necessarily required conclusive evidence that the feared consequences of public disclosure would actually occur. (*City of San Jose, supra*, 74 Cal.App.4th at p. 1024.) Instead, they have looked to human experience in order to form their conclusions on the likely effect of disclosure. (*Ibid.*)

For example, some of the issues raised by Superintendent Deasy—like recruitment or discipline issues—may require expert testimony because they are outside the common knowledge of noneducators. But when it comes to discord in the workplace and disrupted teaching assignments, one could reasonably corroborate Superintendent Deasy's opinions by resorting to common human experience.[15]

Of particular concern is the issue of classroom assignments. Superintendent Deasy stated in his declaration that it is important to maintain a balance of higher performing teachers throughout the District and that "[i]t is human nature for parents to want to insist on having teachers with the highest performance ratings. If parents had access to the performance ratings of teachers, parents would be reasonably expected to battle to ensure that their own children be assigned to the highest-performing teachers, and away from the lower-rated teachers." One need not be an expert educator to know that parents will want the best education for their children. One would certainly expect that if told the AGT scores of each teacher in their child's grade, many parents would

[15] The reliance on common human experience is highlighted by this exchange at the hearing on the Times' CPRA petition:

"[The Court]: What about unhealthy competition, discord among teachers—
"[Times Attorney]: But they have offered no evidence of that.
"[The Court]: We have concerns, and we have—I mean, I tend to think that the human nature supports humiliation. Some people will be humiliated.
"[Times Attorney]: Some people will be humiliated—"

attempt to have their child assigned to the teacher with the higher score and/or away from the teacher with the lower score.

Fact-finders do not always need a declaration from an expert to reach a valid conclusion based upon common sense and human nature. As the court said in *California First Amendment Coalition*, a case involving section 6255, "[T]he facts which drive our legal conclusions . . . refer to the basic generalized knowledge that a fact-finder possesses regarding human affairs, and the way the world works." (*California First Amendment Coalition v. Superior Court* (1998) 67 Cal.App.4th 159, 174.) Indeed, courts have often eschewed the need for expert testimony when matters are within common knowledge and experience.[16]

For the reasons set forth above, the District and UTLA have demonstrated a substantial public interest in nondisclosure of the names of the District's teachers tied to their individual AGT scores. The next question, then, is whether there is a countervailing public interest in their disclosure.

B. The Public Interest in Disclosure

As discussed above, to determine if there is a public interest in disclosure, a court must look to the nature of the information sought and whether release of that information would contribute to the public's understanding of government; whether it would shed light on what "the government has been up to." Thus, we look to whether the release of the AGT score of each teacher, identified by name, would contribute significantly to a public understanding of the District's activities or illuminate how it functions. (See *City of San Jose, supra*, 74 Cal.App.4th at pp. 1008, 1018.) After all, if there is little or no public interest in disclosure, the balance here will easily tilt in favor of nondisclosure.

---

[16] Both federal and California state courts have explained the essence of this rule by citing singer-songwriter Bob Dylan: "You don't need a weatherman to know which way the wind blows." (Bob Dylan, *Subterranean Homesick Blues*, Columbia Records, 1965; see, e.g., *Latino Issues Forum v. U.S. E.P.A.* (9th Cir. 2009) 558 F.3d 936, 949; *Flowers v. Torrance Memorial Hospital Medical Center* (1994) 8 Cal.4th 992, 1001.)

*1. Is the Interest in Learning the AGT Score of Each Teacher, Identified by Name, a Public One?*

Assuming (without deciding) that there is some degree of validity to the AGT scores, knowing the AGT scores of the teachers in the District would shed some light on the effectiveness of the teacher population as a whole, which in turn reflects on an important part of the District's job—recruiting and retaining good teachers. In addition, knowing the scores of the teachers in a given school may shed light on how the District has distributed teachers, school by school. Knowing the scores of the math teachers, or the third grade teachers, could presumably illuminate how that group of teachers is doing, and how they compare to similar groups. These are all things that directly contribute to an understanding of how the District is doing its job. But the District has already released this information, including the AGT scores of each teacher—with names redacted.

What does attaching a name to each teacher's score illuminate? Does knowing the teacher's name "contribute significantly to public understanding of government activities?" In its brief, the Times says that knowing the name of the teacher and his or her AGT score "will help the public gain insight into the effectiveness of individual teachers but, more importantly, it will help the public understand and evaluate LAUSD's performance and its significant investment of public funds into the development of the AGT system." No doubt the public's understanding of LAUSD's performance and its use of public funds is a public interest. But the Times fails to explain how knowing the AGT score of each teacher by name furthers this understanding.

The Times also argues that knowing a teacher's score and his or her name "can help parents understand whether *their child's performance* reflects low performance by the child, an inadequacy in the child's instruction, a systemic problem in the school or District, or something else entirely." (Italics added.) Here, the Times gets closer to the point. Surely, parents will have an interest in the effectiveness of the teacher to whom their child is, or may be, assigned. But it does not necessarily follow that the interest is a *public* one.

The trial court opined that knowledge of the AGT score of teachers identified by name is "but one tool in the parent toolbox . . . ." The Times presented evidence that there was even a direct correlation between teachers with high value-added scores and their students' ultimate earning capacities when they reach adulthood. If true, this suggests that a teacher's AGT score may be of great importance to a child in his or her class. But this evidence proves too much. It tends to support both Superintendent Deasy's opinion and what one would believe through common sense: Parents will naturally have a strong desire to get their children into classes with the highest scoring teachers.[17] That is a very understandable interest. Few things are more important to a parent than maximizing the educational opportunities for his or her child. But as strong as that interest is, it does not directly assist in determining whether the District is fulfilling its statutory obligations; it does not illuminate whether, or how, the government agency is doing its job. While it may give parents a tool with which to assist their own child, it does not help them understand the workings of the agency itself.

This court does not minimize the importance of parental involvement in their children's education. But the interest in having one's child get the best teacher is, at bottom, a private one. Section 6255's catch-all provision requires the court to balance only public interests.

Of course, the presence of a private interest does not preclude a coexistent public interest. Indeed, in applying section 6255 the court does not delve into the motive or purpose of the requester in seeking disclosure.[18] (§ 6257.5; *County of Los Angeles,*

---

**17** One might also reasonably infer that if the scores are perceived to play such an important role in gauging the effectiveness of each teacher, as well as a critical impact on a child's future, disclosure of the unredacted scores would tend to cause humiliation and embarrassment among those with low scores, spur unhealthy comparisons, and generate discord in the workplace (as predicted by Superintendent Deasy).

**18** Nor does the identity of the requester make a difference. Whether an individual or a major newspaper, "'[t]he [CPRA] does not differentiate among those who seek access to public information.' [Citations.]" (*County of Santa Clara, supra*, 170 Cal.App.4th at p. 1324.)

*supra*, 82 Cal.App.4th at pp. 819, 826.)  But it is important not to conflate the two interests, finding a public one where only a private one exists.  "What is material is the *public* interest in disclosure, not the private interest of the requesting party. . . ."  (*State Bd. of Equalization v. Superior Court* (1992) 10 Cal.App.4th 1177, 1191.)  Simply put, the fact that a member of the public is interested in a matter does not, by itself, make it a matter of public interest.

### 2. *A Minimal or Hypothetical Public Interest Will Not Support Disclosure*

Even where a public interest exists, if it is minimal or hypothetical, disclosure will not be compelled.  (*City of San Jose, supra*, 74 Cal.App.4th at p. 1020; see also *County of Santa Clara, supra*, 170 Cal.App.4th at pp. 1324-1325.)  As noted above, the public interest is minimal where the requester "has alternative, less intrusive means of obtaining the information sought."  (*City of San Jose, supra*, 74 Cal.App.4th p. 1020; *County of Santa Clara, supra*, 170 Cal.App.4th at p. 1324.)  The public interest in the identity of public employees is minimal if it does not "'appreciably further' the public's right to monitor the agency's action."  (*Forest Service, supra*, 524 F.3d at pp. 1021, 1025-1027.)  Similarly, where the disclosure of employees' contact information would not shed light on an agency's performance of its duties or otherwise let citizens know what their government is up to, "the relevant public interest supporting disclosure is negligible, at best."  (*Dept. of Defense, supra*, 510 U.S. at pp. 487, 497.)

In its brief to this court, the Times did not clearly articulate how disclosing the unredacted AGT scores would provide further insight into the District's performance, beyond that learned from the information already disclosed.  When questioned on this point at oral argument, its attorney theorized that if the teachers' names were disclosed, parents would be able to "dig deeper" into the AGT score to "understand what the teachers are doing, and whether or not parents can do anything" about differences in the classrooms.  She went on to assert that "if parents could distinguish between teachers, if they can understand what teachers are doing," they could work with the Board to advocate for more effective approaches to raising student test scores.  And she suggested

that parents could sit in the classrooms and "observe, see what the teacher is doing that is effective; see what the teacher is doing that might not be effective."[19]  In other words, if parents knew a particular teacher's AGT score, they could "see what is working and what is not working" in terms of raising the students' scores on standardized tests.

These claims are, at best, hypothetical.  The idea of well-meaning parents, with varying degrees of experience and expertise, intervening in how classrooms are run and how subjects are taught, based on how their child's teacher scored on a complex, controversial statistical analysis, and then reaching their own conclusions to advocate for changes in teaching techniques, hoping to raise student test scores on standardized tests, goes beyond speculation.  The Times presents no basis for believing that such interventions by parents would be helpful, productive, or even feasible.[20]

Based upon the record before us, if there is any *public* interest in disclosing the names of individual teachers' AGT scores, it is minimal or hypothetical.


C.  Balancing the Public Interest in Nondisclosure Against the Public Interest in Disclosure

We turn now to the third prong of the test—striking the balance.[21]  For this part of

---

**19**    Counsel for the Times indicated that its reporters had sat in classrooms and done their own assessments of teachers in light of the Times' value-added scores.  This was consistent with the declaration of LAUSD teacher Karen Caruso submitted to the trial court, stating that conclusions were drawn about her teaching ability based on the observations of a Times reporter who said she "seemed reluctant to challenge [her students]."

**20**    One need not be an expert in education to foresee the potential disruptive effect on the ability of the District to do its job if parents (or newspaper reporters) were involved in this way.  If anything, this argument supports the District's position that *nondisclosure* is in the public interest.

**21**    As noted above, we accept the trial court's express and implied factual findings, if supported by the record.  But we employ a de novo standard to the balancing test, undertaking the weighing process anew.  (*County of Santa Clara, supra*, 170 Cal.App.4th at p. 1323.)

the analysis we assume, without deciding, that there is at least some degree of public interest in disclosure of teachers' names linked to their AGT scores. Next, we decide if that interest is clearly outweighed by the public interest in nondisclosure.[22] We remain mindful that openness in the activities of government is fundamental to the exercise of our constitutional rights and our ability to function as a democracy. Courts must be alert to contentions by government entities that exaggerate the interest in nondisclosure, lest they be used as a pretext for keeping information secret for improper reasons, such as to avoid embarrassment over mistakes, incompetence, or wrongdoing. After all, to some extent any request for disclosure of public records will place a burden on government. Both the voters and their elected officials have established the general policy that this burden is well worth bearing in order to keep democracy vital. If the catch-all provision of the CPRA becomes a loophole used to improperly keep public records from the people, the important purposes of the CPRA would be undermined.

In this case, the District has presented compelling arguments that the public interest is served by nondisclosure of the unredacted AGT scores because releasing them would be detrimental to the functioning of the District and would interfere with its ability to carry out its statutory duties. The Times, of course, does not dispute that there is a public interest in the District running well. It simply claims that the District has failed to meet its burden of showing that the balance of interests clearly weighs in favor of nondisclosure. But the record proves otherwise.

The trial court received evidence by way of the Deasy declaration indicating that disclosure of AGT scores linked to teachers' names would have a detrimental effect on recruitment and retention of teachers; disrupt a balanced assignment of the teaching staff essential to the operations of the District as parents battle for teachers with high AGT

---

[22]    Unlike most of the CPRA, "[s]ection 6255 has no counterpart in the federal Freedom of Information Act, and imposes on the California courts a duty which does not burden the federal courts—the duty to weigh the benefits and costs of disclosure in each particular case." (*American Civil Liberties Union Foundation v. Deukmejian* (1982) 32 Cal.3d 440, 452.)

scores for their children; and generate unhealthy comparisons among teachers and discord in the workplace. The trial court found considerable evidence presented by the District and UTLA that teacher embarrassment, jealousy, and unhealthy comparisons could result from such disclosure. Although the court concluded this did not amount to an unwarranted invasion of privacy, it nevertheless described them as "serious harms."

The Times has failed to contradict this evidence. And it has failed to demonstrate that if a *public* interest in the teachers' names tied to their AGT scores exists, it is anything more than minimal or hypothetical. Moreover, it has not shown that the information already disclosed by the LAUSD—e.g., AGT scores grouped by school, grade, subject, sociodemographics, and teachers (without their names)—is insufficient to satisfy the valid public interest in the District's general performance. After all, "the public interest in efficient and lawful personnel management by government agencies is better served by disclosure of general agency performance rather than by specific revelation of individual problems . . . . Practically no public interest is advanced by disclosure of the latter." (*Braun, supra*, 154 Cal.App.3d at p. 343, citing *Campbell v. United States Civil Service Commission* (1976) 539 F.2d 58, 62.)

In arguing that disclosure is warranted under the CPRA, the Times relies heavily on *Commission on Peace Officer Standards & Training v. Superior Court* (2007) 42 Cal.4th 278 (*POST*) and *International Federation, supra*, 42 Cal.4th 319. However, those cases are readily distinguishable and actually highlight the reasons for nondisclosure in this case. In *POST*, the Times sought the names, employing departments, and dates of employment of peace officer personnel. It did not seek information that had any bearing on the performance or effectiveness of any given peace officer in doing his or her job or any other personal or sensitive information.[23] The Supreme Court ordered disclosure, in part because the government agency had not shown

---

[23] The Times initially sought to learn the reasons officers were terminated from their jobs. But the trial court did not require disclosure of this information, and the Times did not challenge that aspect of the decision on appeal. (*POST, supra*, 42 Cal.4th at p. 287, fn. 2.)

how disclosure of this "innocuous information" could "create mischief." (*POST*, at p. 302.) That is a far cry from the situation here, where the AGT scores are intended to measure teacher effectiveness, are anything but innocuous, and would interfere with the functioning of the District in a number of different ways.

Likewise, in *International Federation* a newspaper sought disclosure of the names and salaries of public employees. The Supreme Court again ordered disclosure, noting that any expectation of privacy by public employees in the amount of their salaries was not a reasonable one. After all, it had long been the case that "the name of every public officer and employee, as well as the amount of his salary, is a matter of public record." (*International Federation, supra*, 42 Cal.4th at p. 331.) Unlike the instant case, there was no effort to discover information about an employee's effectiveness in performing his or her job, nor was there any contention that disclosure would be detrimental to the functioning of a government agency. If anything, *POST* and *International Federation* clearly reveal the difference between the Times' CPRA request here and CPRA requests in prior cases where disclosure was required.

Soon after oral argument in this case, our Supreme Court issued its opinion in *City of Long Beach*, *supra*, 59 Cal.4th 59. In that case, the court ordered the names of individual police officers who took part in certain shootings while on-duty to be disclosed in response to a CPRA request. But the facts and the interests involved in *City of Long Beach* are very different from those before us here.

The CPRA request in *City of Long Beach* sought information about specific incidents where police officers discharged firearms while on duty. These events involve possible serious injury and/or death, and inevitably raise questions regarding the proper use of police power. The city and the police union opposed disclosure of the officers' names, relying largely on statutes dealing with the confidentiality protections afforded peace officers under Penal Code sections 832.7 and 832.8 (the so-called *Pitchess* statutes[24]). These statutes are incorporated into the CPRA via section 6254,

---

[24]     See *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*).

29

subdivision (k).[25] Neither the *Pitchess* statutes nor subdivision (k) of section 6254 are pertinent to the instant case.

*City of Long Beach* also addressed the balancing test set forth in section 6255, which is pertinent to our decision here. But in *City of Long Beach*, there was no contention that disclosure of an individual officer's name would have a negative impact on the operations of the police department as a whole, nor was there a claim that such disclosure would interfere with the department's ability to perform its statutory duties. Here, the District credibly argues that disclosure of teachers' names linked to their AGT scores would be detrimental to the overall functioning of the school district, separate and apart from the impact on any individual teacher.

Moreover, disclosure of the name of an officer involved in a shooting does not necessarily bear on the officer's overall effectiveness in his or her job.[26] After all, it is one thing to ask what an officer did on a particular occasion; it is quite another to ask about his or her general effectiveness as an officer. By contrast, the AGT score of an individual teacher—whether valid or not—is specifically designed to provide insight into the teacher's effectiveness in his or her job. Thus, disclosure would spur unhealthy comparisons among teachers and parents, and would adversely affect the disciplinary process. There is a strong interest in nondisclosure here that was absent in *City of Long Beach*.

On the disclosure side of the scale, the public has a clear interest in learning about officer-involved shootings in order to help it understand and investigate the facts of a specific incident involving the discharge of a firearm, and possible death or serious

---

[25]    Section 6254, subdivision (k) protects "[r]ecords, the disclosure of which is exempted or prohibited pursuant to federal or state law . . . ."

[26]    As the Supreme Court explained:  "Generally speaking . . . [d]isclosure would merely communicate a statement of fact that the named officers were involved in the incident.  It would not imply any judgment that the actions taken were inappropriate or even suspect." (*City of Long Beach, supra*, 59 Cal.4th at p. 72, quoting 91 Ops.Cal.Atty.Gen. 11, 16-17 (2008).)

30

injury. Depending on the circumstances, such an incident could result in civil litigation or even criminal prosecution. It would be virtually impossible to understand the events surrounding such an incident without knowing who did what, and why. Moreover, learning the details of the incident could shed light on overall department policies and procedures involving the use of deadly force. That is a far cry from the instant case, where there is no specific incident to investigate, just the ongoing (albeit important) work of teachers doing their jobs. As discussed above, disclosing the names of teachers tied to their AGT scores—when redacted scores and related information have already been released—contributes little, if anything, to furthering the public interest in how the District is carrying out its statutory duties.[27]

We employ the same section 6255 balancing test used by the court in *City of Long Beach*, and, as required by statute, apply it to the particular facts of the case before us. In striking the balance between the public interest served by nondisclosure of teachers' names linked to their AGT scores versus the public interest, if any, served by disclosure of those names, we conclude that the former clearly outweighs the latter. The AGT scores of individual teachers identified by name need not be disclosed by the District.

### IV. *Are the Unredacted AGT Scores Exempt from Disclosure Under Section 6254, Subdivision (c)?*

In the trial court, there was evidence presented that disclosure of the unredacted AGT scores would have a detrimental effect, both on the District and on individual teachers. These effects may be interrelated. Indeed, when analyzing a case under catch-all section 6255, courts may take guidance from interests protected by the specific

---

[27]  The Times attempts to demonstrate a public interest in disclosure by citing the case of *Marken v. Santa Monica-Malibu Unified School District* (2012) 202 Cal.App.4th 1250. But *Marken* involved allegations of wrongdoing by a teacher that resulted in a reprimand for violation of sexual harassment policy. As in *City of Long Beach*, the goal was to learn about specific incidents that were unrelated to one's general effectiveness on the job. Unlike the instant case, there was no attempt to delve into the effectiveness of thousands of teachers doing their jobs on a routine basis.

exemptions contained in section 6254, since its provisions "will provide appropriate indicia as to the nature of the public interest in nondisclosure and thus will aid the courts in determining the disclosability of a document under section 6255." (*Times Mirror, supra*, 53 Cal.3d at p. 1338.)

The trial judge found that the privacy exemption in section 6254, subdivision (c) does not apply and that the unredacted AGT scores should be disclosed. But we have found that the catch-all exemption in section 6255 does apply. Records "found to be nonexempt under section 6254 . . . can still be withheld under section 6255." (*Braun, supra*, 154 Cal.App.3d at p. 345.)

Since the catch-all section allows the unredacted AGT scores to be withheld, we need not—and do not—address or decide whether disclosure of these scores would constitute an unwarranted invasion of teacher privacy making them exempt under section 6254, subdivision (c). (*Michaelis, supra*, 38 Cal.4th at p. 1077 [court does not consider argument that records are exempt under section 6254 where it had already concluded that the records were exempt under section 6255].)

## V. The "Location Codes"

As discussed above, prior to filing its petition for writ of mandate in the superior court, the Times also attempted to obtain the location codes relating to the specific schools where individual teachers are assigned. Presumably, this would allow the Times to connect a teacher's AGT scores with his or her location, even if the names are redacted. It appears from the record that at some point the District agreed to provide this type of information. However, when the Times' petition was filed, it still contained a request that the location codes be disclosed. The trial court's writ of mandate states that, in addition to releasing all teachers' names with corresponding identification connecting them with their AGT scores, the District should release the "location codes for the teachers' school assignments."[28]

---

[28]    Understandably, the trial court's statement of decision did not discuss this issue.

32

At oral argument before this court, it was clear that the parties had not resolved the location code issue. The nature and extent of their remaining disagreement was uncertain as counsel for each side could not agree on the impact or ramifications of location code disclosure. Now that this court has concluded that the unredacted versions of teacher AGT scores *are* exempt from disclosure, the question of whether the Times is entitled to the location codes remains.

Unlike the teachers' names, the location codes appear to stand on a different footing. It is conceivable that these codes could provide information that may be in the public interest (e.g., by shedding light on how the LAUSD distributes high and low scoring teachers within the district and/or within a given school campus), without creating a significant risk of workplace discord, or parental jockeying for the best teachers, while at the same time being less intrusive or embarrassing to individual teachers. It may be that the location codes represent an "alternative, less intrusive means of obtaining the information sought." But these issues were not addressed in the trial court, and on the record before us it is impossible to assess them. Without that assessment, we cannot determine whether application of the balancing tests in sections 6254 and 6255 would lead to the same, or a different, result.

The disclosure of location codes without teacher names could raise factual questions and legal arguments that have not been fully explored, and may reveal public interest and/or privacy considerations which the trial court previously had no opportunity to separately consider. We will therefore remand the matter to the trial court in order for it to consider the propriety of disclosing the location codes, consistent with views expressed herein.

---

Since it determined the Times was entitled to individual teacher scores tied to their names, requiring disclosure of their location codes added nothing of substance that could not have been gleaned from the unredacted teacher scores themselves.

## VI. Summary

Openness in government is essential to the functioning of a democracy since "implicit in the democratic process is the notion that government should be accountable for its actions." (*International Federation, supra*, 42 Cal.4th at pp. 328-329.) Our Constitution and our statutes expressly establish the public's "right of access to information concerning the conduct of the people's business" (Cal. Const., art. I, § 3, subd. (b)(1)) and provide that the right to obtain records reflecting how the government is going about its business is "a fundamental and necessary right of every person in the state." (§ 6250). However, these rights may conflict with other important private and public interests. The Legislature has indicated which interests should be balanced, but it explicitly delegated to the courts the duty of balancing those interests on a case-by-case basis. Here, a government agency claims that disclosure of certain information would be an unwarranted invasion of its employees' privacy and would also be harmful to its ability to function properly.

AGT scores represent a new and evolving statistical model based upon standardized tests which themselves are the subject of substantial controversy in a dynamic and changing education system. We can make no immutable rule as to whether unredacted teacher AGT scores could be subject to disclosure pursuant to the CPRA under different facts or circumstances that may arise in the future. But on this record, the District has met its burden of showing that disclosure would be detrimental to its ability to perform its statutory duties, separate and apart from whether disclosure justifies a privacy exemption under section 6254. Since the public interest served by not disclosing the names of individual teachers tied to their AGT scores clearly outweighs the public interest, if any, served by such disclosure, the catch-all exemption of section 6255 applies. The District need not disclose the unredacted AGT scores.

However, the case is remanded to the trial court to determine whether the location codes for each unidentified teacher should be disclosed.

## DISPOSITION

The petitions of the LAUSD and the UTLA are granted in part. The matter is remanded to the trial court, which is directed to vacate the judgment entered on August 3, 2013, and to thereafter conduct further proceedings consistent with the views expressed herein before entering a new judgment which (1) denies the Times' petition for a writ of mandate to the extent it seeks release of teachers' names that connect Los Angeles School District teachers to their AGT scores for the years 2009 through 2012, and (2) resolves the issue of disclosure of the location codes.

The parties are to bear their own costs in this writ proceeding. (Cal. Rules of Court, rule 8.493(a)(1).)


KUSSMAN, J.[*]


We concur:


BIGELOW, P. J.


FLIER, J.

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.